BUCHANAN *v.* SMITH.

1. A creditor has reasonable cause to believe his debtor "insolvent" in the sense of the Bankrupt Act, when such a state of facts is brought to his notice respecting the affairs and pecuniary condition of his debtor, as would lead a prudent business man to the conclusion that he, the debtor, is unable to meet his obligations as they mature in the ordinary course of business.

2. A debtor "suffers" or "procures" his property to be seized on execution, when, knowing himself to be insolvent, an admitted creditor who has brought suit against him—and who he knows will, unless he applies for the benefit of the Bankrupt Act, secure a preference over all other creditors—proceeds in the effort to get a judgment until one has been actually got by the perseverance of him the creditor and the default of him the debtor.

3. Such effort by the creditor to get a judgment, and such omission by the debtor to "invoke the protecting shield of the Bankrupt Act" in favor of all his creditors, is a fraud on the Bankrupt Act, and invalidates any judgments obtained.

4. The fact that the debtor, just before the judgments were recovered, may have made a general assignment which he meant for the benefit of all his creditors equally, does not change the case. Such assignment is a nullity.

APPEAL from the Circuit Court for the Northern District of New York, where the proofs, as conceived by the reporter, made a case essentially thus:

The Cascade Paper Manufacturing Company of Penn Yan, New York, had for a long time purchased things used in the manufacture of paper, of Buchanan & Co., merchants in the city of New York, and had habitually given notes in pay-

ment. Its dealings with them were considerable, and its credit so good that it was not limited as to time; that when extensions were asked they were given, and that up to March 3d, 1869, its notes had never lain over or been protested for nonpayment. The notes of the company were indorsed by its officers individually, except in one instance, when accident prevented. On the 3d of March, 1869, however, the company were unable to meet a note to Buchanan & Co., which came due on that day, and telegraphed the fact to these last, adding that they had sent that day a draft for half the amount, and a new note at thirty days for the balance. Buchanan & Co. replied (apparently by telegraph on the same day), that they would protect the note; but in a letter of March 4th, reciting these facts (apparently not having received the promised half remittance and new note), they say:

"We are much disappointed at not receiving anything from you to-day. What does it mean? We had used the note, and it was not at all convenient for us to take care of it at so short notice. We shall certainly expect to hear from you by next mail."

On the 21st of March, 1869, the company's mills were destroyed by fire. The loss was about $80,000; the insurance $45,000 or $47,000. From that time the company did no more business; and, *as it afterwards appeared, it was from that time insolvent.* At the time of the fire Buchanan & Co. held six notes of the company, to wit:

One for $1000, due March 25th, 1869.
One for $2501, due April 2d, 1869.
One for $1141, due April 6th, 1869.
One for $2293.19, due May 4th, 1869.
One for $2305.94, due June 4th, 1869.
One for $2318.69, due July 3d, 1869.

Two days after the fire the company wrote to Buchanan & Co., informing them of the fact, and, apparently, of the magnitude of their loss. These last replied March 23d, expressing sympathy, and "a trust that when you get things more settled *they may not turn out as bad as you now expect.*"

They promised in the same letter to take care of the note of the company due the 25th, and to advise in a few days about the other coming due April 2d.

Just before this fire, Mr. Goodwin, one of the firm of Buchanan & Co., had set off on a tour of business, westward. He reached Penn Yan immediately after the fire, and had an interview with the officers of the company, who informed him of the amount of their loss and insurance, and spoke of the notes, and said, " On account of our misfortune of burning, we shan't be able to meet those notes. Of course we can't get the insurance-money in, and you will have to be easy with us, and wait; but will get your pay in full." They said that all they wanted was their insurance-money to pay all they owed, and as soon as they got that they would commence to pay. They asked to have the notes renewed, which was afterwards done. They said the concern would be solvent if they got their insurance-money, and expressed their expectation of getting it. No statement was made of the company's debts, and Buchanan & Co., according to their own positive testimony, had no knowledge of any particulars, or of the fact of their debts beyond supposition.

The following letters from Buchanan & Co. now were written. What replies, if any came back, did not appear.

NEW YORK, March 29th, 1869.

THE CASCADE PAPER COMPANY.

GENTLEMEN: In relation to renewal of notes, we shall do everything we reasonably can, though we cannot really afford to renew a single one. You must take into consideration that our Mr. Buchanan has recently met with a greater loss by fire, with less than half the amount of insurance you have, and we really need all the money we can command. We have taken care of the $1000 note due 25th, and you will please send us new note with your individual indorsements, and at as short time as possible. Can't you possibly take care of the one due April 2d and 6th? You see our position, and we trust you will meet the matter accordingly.

Yours truly,
BUCHANAN & Co.

NEW YORK, April 2d, 1869.
THE CASCADE PAPER COMPANY.

GENTLEMEN : Your note for $2501 is payable to-day, and up to this time (2 P.M.) we hear nothing from you in regard to it. We shall be obliged to have it protested if we do not hear from you in time. You have not sent us new indorsed note for the $1000 payable March 25th. We trust in these matters you will only rely upon us, as a question of necessity, and not of convenience. Money is very tight, and we need all that is due us.

Yours truly,<br>BUCHANAN & Co.

NEW YORK, April 30th, 1869.
THE CASCADE PAPER COMPANY.

GENTLEMEN : Yours of 29th instant, with inclosure, at hand. We are surprised that you should request us to extend your note due May 4th, for your superintendent, Mr. Joy, gave the writer to understand most distinctly that should be paid when due. This he said to him when at your place in March. Mr. Joy then said if we would renew some notes due about that time (which we did) everything would be met promptly after that. We have been obliged to use that note due the 4th proximo, and we are not in a position to take it up. Our payments about this time are exceedingly large, much greater than usual, and we have need of every dollar we can raise to pay our own liabilities. We cannot, therefore, renew your note. You certainly can in some way, with your connections, raise the money, and, if necessary, you ought to be willing to make any sacrifice to do it. If in no other way, we should suppose you could get an advance for the amount you need on your insurance policies. At any rate, gentlemen, you must in some way contrive to pay the note, for we are not in a position to renew it for you.

Yours truly,<br>BUCHANAN & Co.

NEW YORK, June 5th, 1869.
MR. W. C. JOY,
    Superintendent of the Cascade Paper Company.

DEAR SIR: We were very much surprised and very greatly incommoded by getting notice this morning of protest of your note due yesterday, 4th instant, for $2305.94. Have telegraphed you for explanation, and up to this time, 2½ o'clock, have re-

ceived no reply.   This note had been discounted, and as we had heard nothing from you to the contrary, we supposed, of course, it would be paid.   You promised us when we had to take up the last one, that after that all your notes would be promptly met. Please attend to it at once, and send funds.   What are we to expect in regard to your note due us next week, the 7th instant, for $4701.42 ?   We assure you we are not in a position to take care of that.   You must provide the funds to pay that.   You have no idea how short we are just at this time, and what a disappointment and trouble it has been for us to-day to take care of your note due yesterday.   Let us hear from you at once.

Yours truly,

BUCHANAN & Co.

NEW YORK, June 9th, 1869.

MR. W. C. JOY,.

Superintendent of the Cascade Paper Company.

DEAR SIR : Since writing you yesterday we learn the Manhattan Insurance Company paid you some time since about $5000.   Under the circumstances, think you should have paid us something on account.

As we understand the matter, there is, beside the Buffalo company, unpaid as follows :

| | |
|---|---:|
| Home, N. H., | $10,000 |
| Columbia, N. Y., | 3,000 |
| Market, N. Y., | 3,000 |
| Atlantic, | 3,000 |

On which there is due about $18,500.

We do not know how serious the difficulties in the way of collecting from these companies may be, but from such information as we have been able to obtain, fear you may underrate them.   Under the circumstances we think you should assign your claims against these companies to us, or at least enough of them to cover our claim, which, in round figures, is about $12,000.

The chances of collection in our hands will be quite as good as in yours, and probably a good deal better.   If you are correct in assuming that their refusal to pay is the result of Woodruff's interference and management, the assignment to us would be the very best means you can adopt to avoid litigation and loss.   We suppose you have a board of trustees, and that in case

you make the assignment it will be proper to have a meeting and authorize some officers of the company to execute the assignment. Please let us hear from you by first mail.

Yours truly,

BUCHANAN & CO.

NEW YORK, June 12th, 1869.

G. R. YOUNG, ESQ.,

    President of the Cascade Paper Company.

DEAR SIR : We hold the following notes of the Cascade Paper Company, payable to the order of yourself and Mr. W. C. Joy, and indorsed by you both, viz.:

| | | | | | | |
|---|---|---|---|---|---|---|
| One due May 4th, at Metropolitan Bank, N. Y., | . | . | $2,293 19 | | | |
| " " June 4th, | " | " | " | . | . | 2,305 94 |
| " " 7th, | " | " | " | . | . | 4,701 42 |
| " July 4th, | " | " | " | . | . | 2,318 69 |
| | | | | | | $11,619 24 |

For the note due May 4th we hold as collateral another note of the company for $2318.70, due July 1st, indorsed same as the others. All the above notes, excepting the one due July 4th, have been protested for non-payment. We have from time to time renewed all these notes at the request of Mr. Joy, and Mr. Raplee, treasurer of your company, for reasons given by them at the time. The last excuse given us was, that they were waiting for their insurance-money. Now, as the company have, to our knowledge, collected a large portion of their insurance-money, some $20,000 or more, we think we are entitled to our money, and that we are, under all the circumstances, very unfairly treated. We have this day written Mr. Joy, as superintendent of the company, requesting him to remit us by return mail at least one-half of the amount of our account, and at the same time informing him if it was not done we should at once instruct our lawyers to commence suits against yourself and Mr. Joy as indorsers. We thought it best to inform *you* how this matter stood, as you might not be fully informed in regard to it.

Yours truly,

BUCHANAN & CO.

"In the month of June or July," as was testified by the superintendent of the company, "it became apparent to its officers that the company could not meet its engagements."

On the 19th of the June thus spoken of by the superintendent, that is to say June, 1869, Buchanan & Co. brought suit, in the Supreme Court of New York, against the company and the individual indorsers, Joy and Young, the former superintendent and the latter president of the company, upon the two notes which had fallen due June 4th and June 7th respectively; and immediately after the two notes due July 1st and July 3d, fell due, a suit was brought upon those notes also.

"At the time the suits were commenced," testified the superintendent *in May*, 1870, when he was examined, "I should say, *from my present* standpoint, the company was insolvent." There was no proof in the present proceeding that, when these suits were brought, any debts of the company had matured, except those of Buchanan & Co., and $229 due one Jones.

Each member of the firm of Buchanan & Co., which consisted of four persons, was examined as a witness, and they all testified that their information and belief was, that the company was perfectly solvent, and intended to pay everybody in full; that they commenced the suit because they thought that the company's delay had been unreasonable and unnecessary; that the officers of the company were keeping the insurance-money, which ought to be paid to *them*, and speculating with it; and because the company had promised to pay as soon as they got the insurance-money, and had collected nearly $30,000 of it without paying anything; that the suits were not brought nor anything done subsequently, under any understanding, request, or suggestion of the company; but, on the contrary, that the company requested them to wait longer, and begged them not to think of bringing a suit; that they brought the suit for the purpose of getting their pay by any legal means; that they did not consider the question whether other parties would get their pay or not, for that they did not know that the company owed anybody else.

It appeared in the evidence that the company pleaded in the suits on the notes a misnomer in abatement; and that

Buchanan & Co. made a motion to correct the misnomer, and to strike out the answer as "sham," and for judgment on it as "frivolous." The motion to amend was granted. The company's counsel then insisted that the plaintiffs must re-serve their complaint as amended, and the company have the usual time to answer. In a discussion before the court upon this point the plaintiff's counsel (according to *his* statement as given in the present suit) insisted, as a matter of argument, that where delay was the only object sought by a defendant which did not deny its obligation, delay might work injury to the plaintiffs by enabling other parties to gain a priority *in case of insolvency.* And he suggested insolvency as a possible inference, from the application for delay, for the court to consider upon such a motion. He did not assert it as a fact, and as he testified he had no knowledge or information on the subject and no decided belief on the subject of their solvency or insolvency. The company's counsel emphatically denied the suggestion of insolvency, and objected to any such inference being drawn. The judge said there was no proof on the subject, and gave the company ten days to answer. The company's counsel testified that the statement of insolvency was positively made by the counsel of Buchanan & Co., but admitted that there was nothing in the papers, one way or the other, upon the subject; that it became a matter of argument upon the assertions of counsel made in court, the plaintiff's counsel saying that the company was insolvent and the company's counsel saying that he did not believe it was insolvent, and he admitted that he did, in fact, believe they were solvent, and did say that he so believed in the argument. This argument was made on the 19th or 20th of July.

On the 19th of July a judgment against the company for $229 was recovered by one Jones, which was subsequently satisfied on execution. But Buchanan & Co. testified that they had no knowledge or information of these facts.

On the 21st of July, 1869, the company made a general assignment of all their property and effects to one Benjamin Hoyt in trust to pay their creditors. This assignment was

made under advice of reputable counsel, who advised the company that they might lawfully make it, and that it would be valid.  " The company supposed," according to the testimony of their superintendent, " that the title to all their property would pass to Hoyt, and they intended to have it so pass by the assignment.  They intended it should so pass before Buchanan & Co. could get their judgments and issue executions.  They knew when the assignment was executed that this firm would shortly be entitled to enter judgments, and it was the intention on the part of the company in making the assignment to Hoyt to prevent them from gaining a preference by means of their judgments.  They expected and intended that no property would be left on which they could get any lien.  They did not expect or intend that Buchanan & Co. should get a preference over their other creditors; but intended by the assignment to secure an equal distribution of their property to their creditors, and to prevent any creditor from getting a preference.  The officers of the company consulted together in reference to the assignment.  There was not any difference of view."

The members of the firm of Buchanan & Co. testified that no information of this assignment was given to them, and that they had no knowledge of it until after their liens had attached as hereinafter mentioned.

On the 3d of August, no defences having been entered in any of the suits, Buchanan & Co. recovered judgments against the company in them by default, and against Joy & Young, indorsers on the notes.  On the same day their attorneys sent transcripts of the judgments to the clerk of Yates County, in which the company's real estate was situated, to be docketed by him, and the same were docketed by him on the 4th day of August.

On the same 3d day of August the attorneys of Buchanan & Co. also issued executions on the two judgments to the sheriff of Yates County, wherein personal property of the company was situated, which executions were received by the sheriff on the 4th of August, and were sufficient in form to become liens on that day under the statutes of the State

of New York, upon all the personal property of the defend-
ants within that county. .On the 4th of August Buchanan
& Co. commenced, under the said judgments, certain pro-
ceedings supplementary to execution (which are the substi-
tute under the New York code for a creditor's bill), and
thereby obtained an equitable lien upon all the choses in
action of the company, which proceedings subsequently re-
sulted in the appointment of B. Buchanan (a member of the
firm) as receiver.

The different members of the firm testified that at the
time of commencing the suits, and at the time of recovering
and docketing the judgments, issuing the executions and
commencing the supplementary proceedings, they did not
actually believe that the company was insolvent, or in con-
templation of insolvency, and so far as they were aware,
neither of them had any reasonable cause so to believe; but,
on the contrary, their belief in fact was, and as they sup-
posed their information warranted the belief, that the com-
pany was perfectly solvent. They each further testified that
so far as they were aware, they had no cause to believe that
the company had any intention, view, or desire of giving a
preference to their firm, or making any disposition of prop-
erty in its favor or in fraud of the Bankruptcy Act; but, on
the contrary, they in fact believed that the company was re-
sisting their proceedings with the purpose of delaying, and
so far as possible preventing their obtaining payment of their
claims; that their information and belief was that the com-
pany did all it could to prevent the judgments, executions,
and receiverships; that they thought it a part of the com-
pany's plan not to give them a preference or allow them to
get any if it could help it; that it was doing all it could to
prevent their getting any preference; and that they had no
facts nor any cause to believe that it was showing or per-
mitting them any favor.

The sheriff of Yates County, on receiving the executions,
August 4th, called upon the officers of the company, and
they all said that an execution could not touch the property;
that they had made an assignment, and that it was in Hoyt's

hands; and they supposed that that would exempt the property from levy. They objected to the levy. The sheriff also called on Hoyt, who said there was a general assignment of the company made to him; that he had possession of all the property, and that he thought the sheriff had no right to make a levy. So the sheriff did not levy at that time.

When the attorneys of Buchanan & Co. sent the transcripts of judgments to the clerk of Yates County, on the 3d of August, they wrote him a letter, in which they requested him to docket the judgments, and also to inform them whether there were any other judgments against any of the defendants, or any assignment or transfer of property by any of them, and if so, for a memorandum thereof. The clerk sent back the letter with a memorandum of a judgment recovered by Jones against the company for $229, July 19th; and also of "general assignment, dated July 21st, 1869, B. L. Hoyt, assignee." This letter was received by Buchanan & Co.'s attorneys August 5th. This was the first information, as they testified, which they or their attorneys, so far as they knew, had ever received of the existence of the assignment, or of any judgment against the company other than their own. The attorneys sent for a copy of the assignment and received it on the 7th of August. Mr. Goodwin, one of the firm, went at once to Penn Yan to investigate the circumstances. He arrived there on the 9th, and remained there till the 13th. On arriving at Penn Yan he saw the sheriff, who informed him that the company had made an assignment, and there was not anything to levy on. He also saw Mr. Hoyt, who asserted that the property had vested in him as assignee. He also saw the officers of the company, who said that they had made an assignment of the property which the company formerly owned, and that the assignment was good and valid. Under advice of counsel, Goodwin directed the sheriff to levy, and gave him the bond of indemnity required by him. The sheriff levied on the personal property of the company August 13th.

By orders of the Supreme Court, made in the supplementary proceedings August 13th and 16th, Buchanan was ap-

pointed receiver of the unpaid policies of insurance held by said company, and on the 20th, 21st, and 23d of August commenced suits on them against the insurers, to recover the losses due the company, which suits were still pending.

On the 9th of September a petition in bankruptcy was filed against the company, on which, September 24th, it was adjudicated bankrupt, and one Smith appointed its assignee.

The inventory of the assets and liabilities of the firm filed July 21st, 1869, showed:

| | |
|---|---:|
| Liabilities, . . . . . . . . | $74,775 00 |
| Assets, . . . . . . . . . | 41,435 00 |
| Deficit, . . . . . . . . . | $33,340 00 |

Among the assets were—

| | |
|---|---:|
| Cash in hands of Treasurer, . . . . . | $6,554 70 |
| Claims against insurance companies for loss by fire, | 14,545 30 |

Hereupon Smith filed a bill in the court below against Buchanan & Co., which, after setting forth the appointment of the complainant as assignee, alleged that the judgments in favor of Buchanan & Co. against the company were suffered and procured by the company with intent to give that firm a preference over the other creditors of the company, and with intent to hinder, delay, and impair the operation of the Bankrupt Act; and that that firm, when they entered their judgments and issued their executions, had reasonable cause to believe that the company was insolvent, and that a fraud on the act was intended.

The bill also alleged the illegality of the appointment of the defendant, Buchanan, as receiver of the insurance claims.

The answer set forth the recovery of the judgments, the issuing of the executions, the levies thereunder, and the appointment of the receiver; and put in issue all the allegations of fraud in the recovery of the judgment, and any knowledge on the defendants' part of the insolvency of the company.

The court below gave judgment for the complainant,

granting the relief asked in the bill, and setting aside the judgments under which the defendants claimed their lien.

From that decree this appeal was taken.

It was admitted on both sides in the argument that by the terms of the Bankrupt Act it was necessary that three things should concur to entitle the complainant, as assignee, to the decree prayed in the bill:

1st. That the company, within four months before the filing of the petition against them in bankruptcy, did "*procure or suffer*" their property, or some part thereof, to be attached, sequestered, or seized on execution by Buchanan & Co., with a view to give them a preference.

2d. That the company was insolvent at that time, or in contemplated insolvency.

3d. That Buchanan & Co., at the time the company "procured or suffered" such attachment, sequestration, or seizure of their property (if they did so "procure or suffer" it) had reasonable cause to believe that the company was insolvent, and that they procured or suffered such attachment, sequestration, or seizure of their property to be made to secure such preference and in fraud of the provisions of the act.

*Mr. T. M. North, for the plaintiff in error:*

This case presents a question of great importance. It is, how far a creditor may lawfully use the process of the State courts to collect his debts, and how far the Bankruptcy Act restricts him in that use.

I. We maintain that a creditor may lawfully do all that he might have done before the Bankrupt Act to collect his debts, provided he has no active or passive assistance from a debtor whom he has reasonable cause to believe insolvent and intending to help him to a preference. "The preference which the law condemns," said Chase, C. J., on the circuit, "is a preference made within the limited time *by the bankrupt*, not a priority lawfully gained by creditors. It is as much the policy of the Bankrupt Act to uphold liens and trusts when valid as it is to set them aside when invalid."

Of course Buchanan & Co. intended to collect the bill by

ordinary process in State courts. That is not *per se* unlaw-
ful. No statute has forbidden it; no decisions hold it wrong
*per se.* The machinery of the State courts has not been
abolished by the Bankrupt Act, nor the whole burden of col-
lecting debts thrown on the Federal courts. They did not
intend to violate the letter or spirit of the Bankrupt Act by
any collusion with their debtor. They expected to succeed,
as they did succeed, not only without help from their debtor,
but in spite of its utmost resistance. They believed their
debtor good but slow pay, and meant to enforce the payment
unreasonably delayed. If there were other creditors (as to
which they knew nothing), and if there would not ultimately
be enough for all (which when they perfected their liens,
they had no reason to believe and did not believe) they had
no intention of taking unlawful advantage of them, and
took none. They sought no aid from their debtor and re-
ceived none.

They sought, and they obtained, simply the reward which
the law has for ages given to the energetic and prompt cred-
itor. The maxims " *Vigilantibus non dormientibus,*" and " *Prior
tempore potior est jure,*" have been so far modified by the
Bankrupt Act as that no creditor is allowed to gain any
advantage by his activity if any act, procurement, or even
passive co-operation of the debtor has aided him. But
neither the terms nor policy of the act forbid an honest cred-
itor from keeping the advantage which he has gained by en-
ergetic fighting, in spite of resolute and sincere resistance
of the debtor, even though in failing circumstances, or actu-
ally insolvent. It is only the further prosecution of a suit
which has not yet reached final judgment that is stayed by
bankruptcy. A judgment already obtained is not discharged
unless surrendered by voluntary act of the creditor in prov-
ing his debt. If he chooses not to surrender it, but to stand
on it, the law recognizes his right. In the practical admin-
istration thus far of this law, the lien of a creditor, obtained
without the forbidden co-operation of the debtor by judg-
ment, by execution, or by the appointment of a receiver, be-
fore the filing of a petition in bankruptcy, has been upheld

by repeated adjudications, and the title of the assignee in bankruptcy has been held subordinate to the lien.[*]

1. It is quite clear that the bankrupts did not in fact intend to give the firm a preference. As less than $15,000 of their insurance-money is inventoried as unpaid July 21st, it is plain that $30,000 or $32,000 of it must have been collected after the fire. But the firm got none of it. Indeed the company had on hand on that day $6554.70 cash in their treasurer's hands; which if the company had meant to prefer the firm would have been paid to it. So far from meaning to prefer this firm, the contrary was the fact. The company intended to prevent their getting a preference, and in fact supposed that they had effectually prevented any such preference. They acted under the advice of eminent counsel, who advised them, and they believed it to be true, that the assignment which they made was legal, valid, and sufficient to prevent the firm from gaining a preference. That advice was justified by all the existing decisions. authoritative in that circuit and district. Such an assignment had been held not to conflict with any provision of the Bankruptcy Act, by Nelson, J., in *Sedgwick v. Place*,[†] as well as by Swayne, J., in *Langley v. Perry*,[‡] and *Farrin v. Crawford*.[§] And there had been at that time no decisions to the contrary. It had also been held valid under the State laws by the courts of the State.[||]

2. It is equally clear that the firm did not in fact believe the company intended to give them a preference, but actually believed the intention to be precisely the reverse. How could they have had " reasonable cause to believe " what did not in fact exist, and what every fact and circum-

---

[*] In re Campbell, 1 Abbott's United States Reports, 185; Sampson *v.* Burton, 4 Bankrupt Register, 3; Sedgwick *v.* Minck, by Nelson, J., 1 Id. 204; Wright *v.* Filley, Miller, J., 4 Id. 197; Armstrong *v.* Rickey, Sherman, J., 2 Id. 150; Re Campbell, McCandless, J., 6 Internal Revenue Record, 174; Re Wright, Field, J., 2 Id. 155; Re Schnepf, Benedict, J., 2 Benedict's District Court, 72; and numerous other cases.

[†] 1 Bankrupt Register, 204.　　　　[‡] 2 Id. 180.　　　　[§] Ib. 181.

[||] De Ruyter *v.* St. Peter's Church, 3 New York, 238; Hurlburt *v.* Carter, 21 Barbour, 221; Bowery Bank Case, 5 Abbott's Practice, 415.

stance operating upon their minds tended to make them disbelieve?

3. The firm had no reasonable cause to believe the company insolvent at the time the suits were commenced, or at the time their liens were perfected on the 4th of August.

In the case of a merchant, insolvency might be suspected, from his allowing judgment to be recovered on a just debt, without defence, but in many instances men not engaged in business habitually avoid paying just debts till forced by legal process, and no cause to believe insolvency could be charged on their creditors. Otherwise, as the Supreme Court of New York say in *Hoover* v. *Greenbaum :** 

" If such facts are held to be sufficient to charge a creditor with the knowledge required by the Bankrupt Act, it would be dangerous for any creditor to collect from his debtors the claims he has against them, by legal proceedings."

In an agricultural community the non-payment of notes at maturity does not afford reasonable ground to believe insolvency. The company were not traders at the time that these judgments were recorded, but were in very peculiar circumstances. A presumption reasonable as to merchants in the ordinary course of their business, would be wholly inapplicable to this case.

4. If at the time these liens were obtained, August 4th, the firm had no reasonable cause to believe that their debtors were insolvent, and intended to give them a preference, nothing which occurred afterwards could possibly make that invalid which was valid on the 4th of August.

Neither the information received August 5th, of the assignment and the Jones judgment, nor the knowledge acquired by Mr. Goodwin, August 10th and 11th, nor his directing a levy and indemnifying the sheriff on the 13th, could prejudice the liens acquired on the 4th. We may, therefore, lay out of consideration all that occurred after that date.

5. The burden of proof rests on the assignee. It must

---

* 62 Barbour, 193.

be admitted that, irrespective of the Bankrupt Act, his title is subject to liens of Buchanan & Co. If there is any provision in the act making his title superior to theirs, it is for him to show it, and to prove the facts that make it applicable.

The adjudication of bankruptcy is not even *primâ facie* evidence as against Buchanan & Co., who were not parties to it.*

II. The liens of Buchanan & Co., if not void under the Bankrupt Act, were valid under the laws of the State of New York. Even if not so, this court would not examine into the regularity of the proceedings. It will take notice of the existence and jurisdiction of the Supreme Court of New York, and that it is a court of general jurisdiction; and whether its decision be correct or otherwise, its action, until set aside by some direct proceeding, is regarded as binding in every other court. It cannot be questioned when introduced collaterally, unless it be shown that the court had no jurisdiction.

*Mr. G. Gorham, contra:*

I. 1. On the 3d of August, 1869, when these judgments were recovered, and for a long time prior thereto, indeed immediately after the fire in March, the company was insolvent. As a fact this will not be denied.

2. The company suffered and procured the judgments to be entered, the executions to be issued, and the levy to be made, and thus transferred its property to Buchanan & Co., with a view to give them a preference over its other creditors, and with a view to prevent its property from coming to the assignee in bankruptcy, and from being distributed under the Bankrupt Act, and to impede, and delay, and impair the effect and operation of the act.

(*a.*) The company permitted the judgments to be entered, when by filing its petition in bankruptcy it could have prevented the entry of the judgments.

---

* Re Schick, 2 Benedict, 5; Re Dibblee, 2 Bankruptcy Register, p. 186.

A debtor who is threatened or pressed can prevent the taking of his property on legal process by going into voluntary bankruptcy, and if he does not he clearly allows or suffers the taking.*

(*b.*) The insolvency of the company being established, and the fact being proven that it permitted judgments to be entered and its property to be taken on execution, the intent follows.

The natural consequence of the defendants obtaining judgment and levy was to give them a preference over other creditors, there not being sufficient assets to pay all the creditors in full; and it was also a necessary consequence that so much of the property as was covered by the lien of the judgments and executions would thereby be prevented from reaching the hands of an assignee in bankruptcy; and the intention, aim, and object of bankrupt laws being the equal distribution of the insolvent's estate among all creditors, the judgments and levy necessarily impeded, delayed, and impaired the effect and operation of the Bankrupt Act.†

It is a necessary legal presumption, which ordinarily cannot be rebutted by any evidence of a want of such intention.‡

The fact that the superintendent Joy denies any such intention, cannot do away with this presumption.

(*c.*) The act of suffering the defendants to take the property of the company on legal process, the company being insolvent, was a transfer of the property to the defendants.§

The fact that these judgments were obtained in direct hostility to the bankrupt, does not alter the case.

---

* In re Black & Secor, 1 Bankruptcy Register, 81; In re Craft, Ib. 89; In re Dibblee, Ib. 185; Haskell *v.* Ingalls, 5 Id. 205; In re Forsyth & Murtha, 7 Id. 174.

† Denny *v.* Dana, 2 Cushing, 160; Beals *v.* Clark, 13 Gray, 18; Black & Secor, *supra;* Foster *v.* Hackley, 2 Bankruptcy Register, 131.

‡ In re Smith, 3 Id. 98, and cases cited; Driggs *v.* Moore, Ib. 149; Campbell *v.* Traders' Bank, Ib. 124; In re Dibblee, 2 Id. 185; Morgan *v.* Mastick, Ib. 163; Clark *v.* Binninger, 3 Id. 99.

§ Black & Secor, 1 Id. 82; Same case, 2 Id. 65; Wilson *v.* Brinkman, Ib. 149.

‖ Wilson *v.* Brinkman, Ib. 149; Giddings *v.* Dodd, 1 Dillon, 115.

3. Buchanan & Co. when they entered their judgments, and when they caused levies to be made, had reasonable cause to believe the company to be insolvent.

(*a.*) They held the commercial paper of the company, past due, unpaid, and protested.

(*b.*) They brought suits upon this paper, and knew it was not paid before judgment.*

(*c.*) They knew, by evidence in their own hands, that the company had committed an act of bankruptcy before they commenced their second action, and before the time to answer expired they knew that two acts of bankruptcy had been committed, in that the company had suspended payment of its commercial paper for fourteen days without resuming. These were acts of bankruptcy.

(*d.*) The company had caused to be recorded in Yates County clerk's office, on July 21st, a general assignment reciting its insolvency, and this was notice to the defendants.

(*e.*) Before the levy was made, Goodwin, one of the firm of Buchanan & Co., had seen this record of assignment, had attended the sheriff sale on a prior execution, and had talked with the officers of the company with reference to its affairs.

(*f.*) The transfer of the company's property to these defendants by execution and levy was so extraordinary a transaction, and entirely out of a regular business course, that the defendants were not only put upon inquiry but thereby were *fully advised* of the company's insolvency.†

(*g.*) The fact that each of the judgment creditors denies any reasonable cause to believe in the insolvency of the company, and denies any intent to do anything in contravention of the Bankrupt Act, is of no consequence, because confessedly they had knowledge of *facts which constitute insolvency*, and their denial is rather one of law than fact.‡

4. It follows as a necessary consequence that if Buchanan & Co. had reasonable cause to believe the company insolvent,

---

* Haskell *v.* Ingalls, 5 Bankruptcy Register, 205.

† Wilson *v.* City Bank, 5 Bankruptcy Register, 270.

‡ Rison *v.* Knapp, 1 Dillon, 186.

they had like cause to believe a fraud upon the act was being committed. By their proceedings they were seeking to get a preference over the other creditors of the company, while the Bankrupt Act requires that all creditors shall share alike. The object of Buchanan & Co. in suing the notes held by them, was to get their money whether other creditors got theirs or not. They were not satisfied with the general assignment without preferences which the company had executed, and by which they would have been placed on a footing with all the other creditors; but avoided that by compelling the sheriff to levy under a bond of indemnity, and by obtaining a judgment setting aside the assignment.

They must be presumed to know that the natural, the necessary, consequences of their acts was to obtain that which was a fraud upon the Bankrupt Act.

This court has met this question, and held that when the bankrupt has shown by acts of bankruptcy, which are certain tests of insolvency, that he is unable to meet his engagements, one creditor cannot, by a race of diligence, obtain a preference to the injury of others.[*] Such conduct is considered a fraud on the act, whose aim is to divide the assets equally, and therefore equitably. This ruling has been followed by the courts under the present act.

II. The appointment of Buchanan as receiver of the claims against the insurance companies, was a nullity. Sections 292 and 294 of the New York Code of Procedure, in reference to proceedings supplementary to execution, have no applicability to incorporations.[†]

*Reply:* A debtor does not, in the sense of the Bankrupt Act, "*suffer*" his property to be taken, if he in good faith uses, as he is advised and believes, effectual means to prevent it, and fails only by mistake, misfortune, lack of

---

[*] Shawhan *v.* Wherritt, 7 Howard, 644.

[†] Hinds *v.* Canandaigua and Niagara Falls Railroad Co., 10 Howard's Practice, 487; Sherwood *v.* Buffalo and New York City Railroad Co., 12 Id. 136.

time, or accident.* The word "suffer," in this connection implies volition, something voluntarily and knowingly omitted. It was added to cover acts of wilful omission, not embraced in the word "procure." It is to be used in the sense of "allow," or "permit," not of "endure." A man suffers, permits, or allows that which he could, but does not desire to, prevent. He simply *endures* that which he has done the best he knew how to avoid.† It must be an act of *volition* on his part; it must be, in other words, something that is done *voluntarily*.

The context of the statute shows that it must be a suffering "*with intent* to give a preference," which is inconsistent with the sense of involuntary endurance.

Is every debtor bound to run a race of diligence with his creditor? Is every creditor bound to see that his debtor does run such a race, and, at his peril, to see to it that the debtor wins the race? Are the proceedings in State courts to be used merely as a spur to the debtor to make him run?

Mr. Justice CLIFFORD delivered the opinion of the court.

Preferences, as well as fraudulent conveyances, are, under certain circumstances, declared to be void if made by a debtor actually insolvent, or in contemplation of insolvency, within four months before the filing of the petition by or against him as a bankrupt.‡

Those circumstances, so far as that rule of decision is applicable to this case, are, if the debtor procures any part of his property within that period to be attached, sequestered, or seized on execution with a view to give a preference to any creditor or person having a claim against him, or who is under any liability for him, that such attachment, sequestration, or seizure is void, provided it also appears that the creditor making the attachment, sequestration, or seizure, or the person to be benefited thereby, had reasonable cause

---

* Armstrong *v.* Rickey, 2 Bankruptcy Register, 150; Re Schnepf, 2 Benedict's District Court, 72.

† Campbell *v.* Traders' Bank, 3 Bankruptcy Register, 124.

‡ 14 Stat. at Large, 534.

to believe that the debtor was insolvent, and that the attachment, sequestration, or seizure was procured in fraud of the provisions of the Bankrupt Act.

On the 9th of September, 1869, a creditor of the corporation respondents filed a petition in bankruptcy against the company, in the office of the clerk of the District Court, and on the twenty-fourth of the same month the District Court adjudged the said paper manufacturing company to be bankrupts within the true intent and meaning of the Bankrupt Act.

Pursuant to that decree the appellee, on the 10th of November following, was duly appointed assignee of the estate of the bankrupts, and the register having charge of the case, there being no opposing interest, by an instrument in writing under his hand assigned and conveyed to the said assignee all the property and estate, real and personal, of the bankrupts.

By virtue of that instrument of assignment and conveyance all the real and personal estate of the bankrupts, with all their deeds, books, and papers relating thereto, became vested in the appellee as such assignee. Such instrument of assignment and conveyance embraced the several parcels of real estate described in the bill of complaint and certain personal property at that time in the hands of an assignee appointed by the State court, or in the custody of the sheriff of the county, but which has since been in part sold by the sheriff and the proceeds have been paid into the registry of the District Court. Five policies of insurance upon the property of the bankrupts, which had been destroyed by fire and for which losses the insurance companies were liable, were also included in the said instrument of assignment and conveyance.

Complaint is made by the appellee in the bill that the respondents, or the three first named, on the 3d of August, prior to the decree adjudging the corporation respondents bankrupts, recovered two several judgments against the bankrupt company, in the Supreme Court of the State,

amounting in the aggregate to the sum of $11,815.65; that the said judgments, on the day following, were docketed in the office of the clerk of the county, where the judgments still remain of record, and constitute an apparent lien upon the property and estate so assigned and conveyed to the appellee as such assignee, and are a cloud upon his title.

Apart from that he also claims that the same parties took out executions upon the said judgments and delivered the same to the sheriff of the county, and that the sheriff, on the 11th of the same month, levied the executions upon certain personal property of the bankrupt company which he held in possession when the petition in bankruptcy was filed, and he alleges that the sheriff, by order of the District Court duly entered, has since sold the said personal property and paid the proceeds into the registry of the bankrupt court; that the other respondent claims that he has been appointed receiver of the several policies of insurance, and that he has commenced actions against the insurance companies to recover the losses suffered by the burning of the property covered by the said policies, in consequence of which the insurance companies refuse to pay said losses to the complainant.

Both the allegations of the bill and the proofs show that the corporation respondents, on the said 3d of August and long prior thereto, were utterly insolvent and bankrupts, and the complainant charges that they procured and suffered the said judgments in favor of the parties named to be entered and their own property to be attached, sequestered, and seized, as alleged, with intent to give to those creditors a preference over their other creditors, and that they intended by such disposition of their property to defeat and delay the operation of the Bankrupt Act; that the said judgment creditors, throughout those proceedings, had reasonable cause to believe that the debtor company was insolvent, and that the judgments were entered, the executions issued, and the levies made in fraud of the provisions of the Bankrupt Act, and that the proceedings were commenced and prosecuted with a view to prevent the property from

coming to the assignee in bankruptcy and from being distributed under said act.

Service was made and the said judgment creditors appeared and filed an answer, and a separate answer was filed by the respondent claiming to be the receiver of the policies of insurance. Proofs were taken and the parties were heard and the court entered a decree for the complainant, and from that decree the respondents appealed to this court.

Most or all of the defences which it becomes material to consider consist of denials that the charges contained in the bill of complaint are true, and in that respect the two answers are substantially alike. Briefly described the answers deny that the corporation respondents did procure or suffer the said judgments to be entered, or their property to be taken upon legal process issued upon said judgments, with intent thereby to give to those judgment creditors a preference over their other creditors, or with intent to defeat or delay, by such disposition of their property, the operation of the Bankrupt Act; or that they had reasonable cause to believe that the respondent company was insolvent, or that the judgments were entered or the executions issued or the levies made in fraud of the provisions of the Bankrupt Act; or that such proceedings were instituted with a view to prevent the property of the bankrupts from coming to the assignee in bankruptcy, or to prevent the same from being distributed under the said act, as charged in the bill of complaint.

Fraudulent preference is the *gravamen* of the charge, and the complainant, as the assignee of the estate of the bankrupts, prays that the said judgments and all the proceedings in the suits may be decreed to be void and of no effect, and that the judgments, executions, and levies may be vacated and set aside, and that it may be decreed that he, as such assignee, is entitled to have and receive all the real and personal estate of the bankrupts free and clear of any lien by virtue of the said judgments, or of any of the aforesaid proceedings, and for an injunction

Three things must concur to entitle the complainant, as such assignee, to the decree as prayed in the bill of complaint: (1.) That the corporation respondents, within four months before the filing of the petition against them in bankruptcy, did procure or suffer their property, or some part thereof, to be attached, sequestered, or seized on execution by the said judgment creditors, with a view to give a preference to such creditors by such attachment, sequestration or seizure, over their other creditors. (2.) That the corporation respondents were insolvent at that time, or in contemplation of insolvency. (3.) That the judgment creditors, at the time their debtors, the corporation respondents, procured or suffered such attachment, sequestration, or seizure of the aforesaid property belonging to the said debtors, had reasonable cause to believe that the debtors whose property was so attached, sequestered, or seized, were insolvent, and that they procured or suffered such attachment, sequestration, or seizure of such property to be made to secure such preference and in fraud of the provisions of the Bankrupt Act.

Equal distribution of the property of the bankrupt, *pro rata*, is the main purpose which the Bankrupt Act seeks to accomplish, and it is clear to a demonstration that the end and aim of those who framed the act must be defeated in this case if the proceedings of the judgment creditors are sustained, as they have perfected liens, by those proceedings, upon all or nearly all of the visible property of the bankrupts.

Until the debtor commits an act of bankruptcy it is doubtless true that any creditor may lawfully sue out any proper process to enforce the payment of debts overdue, and may proceed to judgment, execution, seizure, and sale of his property; but it is equally true that the appointment of an assignee under a decree in bankruptcy relates back to the commencement of the bankrupt proceedings, and that the instrument required to be executed, under the hand of the judge or register, assigns and conveys to the assignee all the estate, real and personal, of the bankrupt, including

equitable as well as legal rights, and interests and things in action as well as those in possession, which belonged to the debtor at the time the petition in bankruptcy was filed in the District Court.*

Conceded, as that proposition must be, it is obvious that the judgment creditors could not acquire any interest in the property of the debtor by virtue of the order of the State court extending the powers of the receiver, previously appointed to collect the several amounts due from the insurance companies, to all the other estate, real, personal, and mixed, of the bankrupts, as it is admitted in the answer that the order in question was passed subsequent to the filing of the petition in bankruptcy, which is the foundation of the decree adjudging the corporation respondents to be bankrupts. Suppose it were otherwise, still the same conclusion must follow, as the court is of the opinion that all the essential allegations of the bill of complaint are established.

Much discussion to show that the paper company was insolvent is certainly unnecessary, as the answer admits the fact to be as alleged in the bill of complaint. They failed to meet their paper at maturity as early as the 4th of March, 1869, as conclusively appears from the letter of the principal appellants to the treasurer of the company, acknowledging the receipt of a telegram from him to the effect that the company could not pay their note falling due on that day.

It appears by the record that the bankrupt company was engaged in the manufacture of paper; that they had for a long time purchased goods for the purpose of the principal appellants on credit; that the appellants at that time held six notes against them, some of which were overdue; that the mills of the company, on the 20th of the same month, were destroyed by fire, which prevented the company from transacting any further business.

Correspondence immediately ensued between the appellants and the bankrupt company or their superintendent. Two days after the fire the company informed the appellants

---

* 14 Stat. at Large, 522.

of their misfortune, and the appellants replied on the follow-
ing day, promising to take care of one of their notes and to
advise them, in a few days, as to another which would fall
due in a short time. Immediately one of the appellants
visited the superintendent of the bankrupt company for the
purpose of ascertaining the extent of their loss and whether
they would be able to take care of their unpaid notes.

Application was soon after made to the appellants by the
company that they should consent to renew the notes, and
for an extension of the time of payment, which led to fur-
ther correspondence and to some crimination, the appellants
charging that the officers of the company had promised that
all the notes should be promptly met, and that they had
failed to make good their promise, and insisting that they
must provide funds for that purpose. Urgent demands to
that effect were made by the appellants, as appears by the
letters given in evidence, but the bankrupts failed to supply
the necessary funds, and the appellants, though they at first
refused so to do, finally consented to renew all of the notes
except two, reducing the number from six to four, as ap-
pears by their own testimony.

Those four notes were as follows: (1.) Note dated April
2d, 1869, for $4701.42, payable in sixty-three days from date.
(2.) Note dated May 4th, 1869, for $2318.70, payable in fifty-
five days from date. (3.) Note dated November 6th, 1868,
for $2305.94, payable June 4th next after its date. (4.) Note
dated November 16th, 1868, for $2318.69, payable the 3d of
July next after its date.

Repeated demands for payment having been ineffectual,
the appellants, on the 9th of June subsequent to the fire,
suggested to the superintendent of the company that the
chances of collecting the insurance-money would be better
if the policies were placed in their hands, and urged that
the company should assign their claims under the policies
of insurance to them, " or at least enough of them to cover
our claim, which in round numbers is about $12,000." Such
a course, it was suggested in the same letter, would be the
very best means they (the company) could adopt to *avoid liti-*

*gation and loss,* which affords convincing evidence that it was the purpose and intention of the appellants to secure a preference over the other creditors of the company.

Persuasion having failed to accomplish the purpose, the appellants, in a letter dated three days later and addressed to the president of the company, presented a schedule of the notes renewed and unpaid, complaining that they had been very unfairly treated, and informed him that unless one-half of the amount due to them was remitted by return mail, they should instruct their attorneys to commence suits against him and the superintendent of the company as indorsers of the notes. Instead of yielding at that time to the threat of the appellants, the corporation bankrupts, on the 21st of July following, made, executed, and delivered to one Benjamin Hoyt an indenture of assignment, wherein they pretended to convey to the said assignee all their real and personal property in trust, to convert the same into money, and with the proceeds to pay the debts of the company.

Extended discussion of that transaction, however, is quite unnecessary, as both parties agree that the said assignment was made in contemplation of insolvency, contrary to the provisions of the revised statutes of the State, and to hinder, delay, and defraud creditors. Whether the instructions were given to the attorneys, as threatened, does not appear, but it does appear that the notes overdue were protested and that those notes, on the 19th of the same month, were put in suit against the bankrupt company, and that a second suit was commenced against the company upon the other two notes immediately after they fell due.

Enough appears both in the pleadings and proofs to show that those suits, on the 3d of August following, were pending in the State court, and that the principal appellants on that day recovered judgment in both suits against the corporation defendants. Judgment in one of the suits was rendered for the sum of $7118.14, and in the other for the sum of $4197.51, as appears by the record. Both judgments were entered and perfected on the same day, and on the following day transcripts thereof were duly filed and the re-

spective judgments were duly docketed in the office of the clerk of the county, so as to become, at least in form, a lien on all the estate, real and personal, belonging to the bankrupt corporation.

Argument to show that the purpose of the principal appellants in attaching, sequestering, and seizing the property of the bankrupt company, as charged in the bill of complaint, was to obtain a preference over the other creditors of the company, is hardly necessary, as the charge is fully proved, and it is equally certain that the debtors throughout the entire period from the commencement to the close of those proceedings were hopelessly insolvent, and the acts, conduct, and declarations of the appellants, in the judgment of this court, afford the most convincing proof that they had reasonable cause to believe, even if they did not positively know, that such was the actual pecuniary condition of their debtors.

Attempt is made to satisfy the court that the debtors themselves did not know that they were insolvent, but the theory, in view of the evidence, is not supported, and must be rejected as improbable and as satisfactorily disproved.

Even suppose that is so, still it is insisted by the appellants that the decree is erroneous because it is not proved, as they contend, that the bankrupts procured or suffered their property to be attached, sequestered, or seized by the appellants, as charged in the bill of complaint, within the true intent and meaning of the Bankrupt Act. Properly viewed, they insist that their acts and conduct only show that they have used the process of the State courts, as they had a right to do, to collect their debts due from the insolvent company, and they submit the proposition that a creditor may lawfully do all he might have done before the Bankrupt Act was passed to collect his debts, provided he has no active or passive assistance from his debtor, whom he has reasonable cause to believe to be insolvent, to help him to secure such a preference over the other creditors of the debtor.

Creditors, it is conceded, are forbidden to sue out State process, within the said four months, and employ it to create

and perfect such liens on the property of their debtor, by his active or passive assistance, but the proposition submitted is that whatever they can obtain of their insolvent debtor, in that way, under such process, by their own energy and activity, in spite of the debtor, they may lawfully retain, and that such liens are not displaced or dissolved by any subsequent bankrupt proceedings.

Strong doubts are entertained whether the proposition could be sustained, even if the theory of fact which it assumes was fully proved, as the fourteenth section of the Bankrupt Act provides to the effect that the required instrument of assignment, when duly executed, shall vest in said assignee the title to all the property and estate of the bankrupt, although the same is then attached on mesne process as the property of the debtor, where the attachment was made within four months next preceding the commencement of the bankrupt proceedings, but it is not necessary to decide that question at this time, as the evidence is full to the point that the judgment creditors in this case did have the passive assistance of the bankrupt debtors in obtaining their judgments and in perfecting their liens, under the State process and laws, upon all the property, real and personal, of their debtors.

Throughout it was plainly the purpose of the principal appellants to obtain a preference over the other creditors of the bankrupt company, either by payment or assignment, and it must be conceded that the officers of the company for a time refused or declined to comply with any such request or intimation or in any way to promote their purpose, but the facts and circumstances disclosed in the record fully warrant the conclusion of the Circuit Court that they ultimately acquiesced in what was done by the appellants, even if they did not actively promote the consummation of the several measures which they, the appellants, adopted to perfect liens upon all the visible property of the bankrupt company, unless it exceeded in value the amount of their judgments.*

---

* Hilliard on Bankruptcy, 3d ed., 322–330.

Sufficient is shown to satisfy the court that those having charge of the affairs of the corporation respondents knew that they were insolvent, and that they also knew that it was the purpose and intent of the principal appellants to secure a preference over the other creditors of the bankrupt corporation. Insolvent as they knew the company to be, they could not, as reasonable men, expect that all the debts of the company would be paid, and they must have known that the appellants would secure a preference over all the other creditors of the company if they suffered them, without invoking the protecting shield of the Bankrupt Act, to recover judgments in the two pending suits, and to perfect the other measures which they subsequently adopted to give effect to their liens upon all the property of the corporation bankrupts.*

Tested by these considerations the court is of the opinion that the findings of the Circuit Court were correct, and that the allegations of the bill of complaint are sustained, as follows: (1.) That the corporation respondents, within four months before the filing of the petition against them in bankruptcy, did procure or suffer their property to be attached, sequestered, or seized on execution by the principal appellants, with a view to give a preference to such creditors by such attachment, sequestration, or seizure, over their other creditors. (2.) That the corporation respondents were insolvent at that time, or in contemplation of insolvency. (3.) That the judgment creditors, at the time their said debtors procured or suffered such attachment, sequestration, or seizure of the aforesaid property belonging to the said debtors, had reasonable cause to believe that the said debtors whose property was so attached, sequestered, or seized were insolvent, and that they procured or suffered such attachment, sequestration, or seizure of such property to be made to secure such preference, and in fraud of the provisions of the Bankrupt Act.†

---

* Marshall v. Lamb, 5 Adolphus & Ellis, New Series, 126.

† Shawhan v. Wherritt, 7 Howard, 644; Fernald v. Gay, 12 Cushing, 596; Scammon, Assignee, v. Cole et al., 5 National Bankrupt Register, 257;

Insolvency in the sense of the Bankrupt Act means that the party whose business affairs are in question is unable to pay his debts as they become due in the ordinary course of his daily transactions, and a creditor may be said to have reasonable cause to believe his debtor to be insolvent when such a state of facts is brought to his notice respecting the affairs and pecuniary condition of his debtor, in a case like the present, as would lead a prudent business man to the conclusion that he, the debtor, is unable to meet his obligations as they mature in the ordinary course of business.

Such a party, that is, a creditor securing a preference from his debtor over the other creditors of the debtor, cannot be said to have had reasonable cause to believe that his debtor was insolvent at the time unless such was the fact, but if it appears that the debtor giving the preference, whether a merchant or trading company, was actually insolvent and that the means of knowledge upon the subject were at hand, and that such facts and circumstances were known to the creditor securing the preference, as clearly ought to have put him, as a prudent man, upon inquiry, it would seem to be a just rule of law to hold that he had reasonable cause to believe that the debtor was insolvent, if it appears that he might have ascertained the fact by reasonable inquiry. Ordinary prudence is required of a creditor under such circumstances, and if he fails to investigate when put upon inquiry he is chargeable with all the knowledge it is reasonable to suppose he would have acquired if he had performed his duty.* Such proceedings, therefore, must be held invalid, as they were promoted and prosecuted by the parties acting in fraud of the Bankrupt Act, and inasmuch as that conclusion affects the judgments recovered by the appellants, it will not be necessary to bestow much consideration upon the subsequent proceedings to perfect the liens or to the order for the appointment of a receiver, or to the second

---

Same case, 3 Id 100; Smith, Assignee, *v.* Buchanan, 4 Id. 133; Same case, 8 Blatchford, 153.

* Toof *v.* Martin, Assignee, 13 Wallace, 40; Scammon, Assignee, *v.* Cole, 5 National Bankrupt Register, 263.

order extending his jurisdiction and enlarging his powers. Evidently the judgments must be set aside as being superseded by the proceedings in bankruptcy, and if so, it is quite clear that all the subsequent proceedings founded upon those judgments become inoperative and ineffectual to prevent the assignee in bankruptcy from exercising the same power and dominion over all the property and estate of the bankrupts, as he might have exercised if such judgments had never been rendered, or no such subsequent proceedings had ever taken place. Creditors issuing executions on judgments obtained upon demands long overdue against a bankrupt, who has been pressed in repeated instances to pay or secure the demands and has failed to do so because of his inability, must be held to have had reasonable cause to believe that his debtor was insolvent.[*]

It was suggested at the argument that the appointment of the receiver was an independent order of the State court, and that the action of the State court must be regarded as valid until it is set aside by some direct proceeding, but it is a sufficient answer to that objection to say that the State statute under which the appointment was made has no application whatever to corporations, and that the proceeding must be regarded as wholly unauthorized and void.[†] Judgment creditors of a corporation, it is held, do not obtain a preference by such a proceeding, but must proceed according to the provisions of the article relative to the sequestration of the property and effects of corporations for the benefit of creditors.[‡]

Viewed in any light the court is of the opinion that neither the decree of the State court appointing the receiver nor the order enlarging his powers, nor any of his proceedings under those powers, afford any defence to the bill of complaint.

DECREE AFFIRMED.

---

[*] Wilson *v.* City Bank, Ib. 270; Foster *v.* Goulding, 9 Gray, 52.

[†] Code, §§ 292, 294; Hinds *v.* Railroad Co., 10 Howard's Practice Report, 487; Sherwood *v.* Railroad Co., 12 Id. 136.

[‡] Sessions Acts, 1825, p. 449; 2 Revised Statutes, 463; Morgan *v.* Railroad, 10 Paige's Chancery, 290; Loring *v.* Gutta-Percha and Packing Co., 36 Barbour, 32

BRADLEY, J.:

I dissent from the opinion of the court just read. In my opinion an adversary suit against an insolvent person may be prosecuted to judgment up to the very moment of bankruptcy. The diligent debtor cannot be deterred from such prosecution by a knowledge that his debtor is insolvent, or by any apprehensions that bankrupt proceedings may be in contemplation. He is not bound, himself, to petition against his debtor in bankruptcy, nor does the neglect of his debtor to file such a petition deprive him of his fairly-gained preference, unless complicity between them can be shown, of which in my opinion there was no evidence in this case.

Justices MILLER and DAVIS did not sit.