WILLIAM H. SKIRM et al.

*v.*

THE EASTERN RUBBER MANUFACTURING COMPANY.

[Filed July 20th, 1898.]

1. A corporation, being involved and in the hands of a receiver, arranged, through its officers, with a majority of its creditors for an extension by giving four time-notes to each creditor to cover his claim, and the receiver was thereupon discharged. Two of the creditors did not receive notes under such

arrangement. Payment on the first of the series of notes was defaulted, and it was then proposed to take up the notes by an issue of bonds in lieu of them, secured by mortgage on the corporation property, which proposition was accepted by a majority of the creditors, and the bonds were issued to them, some, however, retaining their notes and others being paid cash.—*Held*, that at the time of executing the bonds and mortgage the corporation was insolvent, within Corporation act § 64, which prohibits transfers by insolvent corporations.

2. Creditors who took deferred-payment notes to cover their claims against an insolvent corporation, and, on default of payment, surrendered them for corporate bonds issued to take up such indebtedness, are not *bona fide* purchasers of the bonds.

3. Where creditors took deferred-payment notes to cover their claims against an insolvent corporation, and, on default of payment, surrendered them for corporate bonds issued to take up such indebtedness, some of which notes bore the personal endorsement of the president and principal stockholder, the agreement, being in the nature of a composition, invalidated the endorsement, because it was given to only part of the creditors, and hence it was not a matter of value so as to constitute the takers of the bonds purchasers for value.

*Mr. Alvah A. Clark* and *Mr. Henry W. Calhoun*, for the Central Trust Company.

*Mr. John T. Bird* and *Mr. Woodbury D. Holt*, for the Eastern Rubber Manufacturing Company.

*Mr. Chauncey G. Parker*, for a judgment creditor.

REED, V. C.

This is an appeal from a decision of the receiver of the Eastern Rubber Manufacturing Company rejecting a claim made by the Central Trust Company as a preferred claim. The Central Trust Company is trustee for certain bondholders, secured by a mortgage. The mortgage was executed by the Eastern Rubber Manufacturing Company to the trustee on May 1st, 1896, and covers all the real estate and machinery. It was made to secure an issue of proposed bonds amounting to $110,000, of which bonds $106,000 were afterwards issued to creditors of the Eastern Rubber Manufacturing Company.

The receiver, on November 13th, 1897, rejected the claim made by the Central Trust Company, that this mortgage, to the

amount of the bonds issued, was a preferred claim. The rejection was put upon the ground that the Eastern Rubber Manufacturing Company, at the time of the execution of this mortgage, was an insolvent corporation, and that the mortgage was not made to secure all, but only some of its creditors. From this decision of the receiver this appeal is taken.

All the property of the insolvent company was ordered, on October 1st, 1897, to be sold free of all encumbrances. It was sold on November 11th, bringing $32,500, subject to taxes only amounting to $4,793.85. This fund is now in court.

It was proven in the cause that, of the creditors existing at the time of the execution of this mortgage, some refused to receive the bonds, and to others, among which was the Trenton Rubber Company, no bonds at all were tendered.

If, in fact, therefore, the mortgagor was at the time of the execution of the mortgage insolvent, that instrument was a nullity under the provision of the Corporation act. The sixty-fourth section of this act provides that whenever any corporation shall become insolvent, or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officers or agents of the corporation shall sell, convey, assign or transfer any of its estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements, nor shall they or either of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; provided, that a *bona fide* purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached.

Upon the argument, the question of the insolvency of the defendant was, by the counsel for the trust company, made to turn upon whether an unpaid subscription of about $90,000 due from Frank A. Magowan, the president and principal subscriber of the Eastern Rubber Manufacturing Company, was or was not

Skirm v. Eastern Rubber Manuf. Co.

an asset of value. The way in which this item assumes import-ance is that in several statements and estimates of the property and the debts of the company, this item of $90,000, if allowed as a valuable asset, makes the amount of debts less than the value of the property, while, if eliminated as an uncollectible asset, it reduces the property of the company below the amount of the debts. This condition of affairs existed on May 1st, 1896, when the mortgage was made.

The exact insistence is that there is nothing in the case to show that at this time this sum of money was not collectible from Magowan, and that if such part of it was collectible as would make the assets of a value equal to the value of the property, then the company could not be regarded as insolvent.

To understand the condition of this company and the relation of Magowan to it, it is necessary to recall that the present receiver is the second officer that has been appointed for this corporation.

On August 3d, 1895, it was put in the hands of a receiver as an insolvent corporation. Subsequently the consent of the great body of its creditors was obtained to an extension. Under an arrangement entered into between the officers of the corporation, or, I may say, the officer of the corporation (for Magowan was the only one who figured in it) and its creditors, four extension notes were to be given to each of the several creditors of the company, with the exception of the Trenton Rubber Company and a few creditors who were paid in cash, and one other who received neither notes nor cash. Four notes were given to each of the creditors, each note for one-quarter of his debts. The notes were dated September 26th, 1895, payable at six, twelve, eighteen and twenty-four months respectively. Under this arrangement the consent of the creditors was obtained for the discharge of the receiver and the resumption of the property by the corporation.

The first installment of these notes matured on March 29th, 1896, and the company was unable to pay. It then, through Magowan, proposed to secure the creditors by issuing bonds, to be taken by the creditors instead of the notes, the bonds to

Skirm v. Eastern Rubber Manuf. Co.

be secured by a mortgage. A large majority of the creditors accepted the proposal and bonds were issued to them. Some of the creditors refused to accept them, and of those, some were paid and others retained their old notes. The mortgage executed to secure these bonds is the one now in question.

The company, therefore, had been taken out of the hands of the receiver by giving extension notes to the great body of its creditors, amounting to $141,000. This volume of debt was not extinguished at the time, but its payment was spread over a period of two years. The affairs of the company, it is apparent to my mind, were in such straits that if they had been then wound up the creditors could not have hoped to realize the amount of their debts. They therefore preferred to give an extension, in the hope that the future business of the company might enable it to pay all, or if not all still a greater part, of the debts than could be realized by a sale of the plant at that time.

The company continued its business for some months longer, until the first installment of notes matured. As already remarked, it could not pay them. Magowan owed $90,000 for stock and had owed it at the time the first receiver was appointed. None of this was paid in at either of the company's critical financial periods. It has, in fact, remained unpaid from the time of the organization of the corporation. Mr. Servis says that it was impossible to get Magowan to pay any money into the concern. Then came the proposition to secure the extension-note creditors by the mortgage. The extension of the mortgage staved off the collapse of the corporation until April, 1897, when it went into the hands of the present receiver.

It is to my mind entirely obvious that in May, 1896, the company was insolvent. The valuation of the property of this corporation, taken at different times, coupled with the fact that the sum realized from its subsequent sale was less than one-half its valuation, displays, clearly, that it was not possible to realize enough to pay its debts.

But if, upon winding up, there had been a surplus, nevertheless a condition of insolvency existed at the time of the execu-

tion of this mortgage. The company was so conditioned that it could not pay its debts, and it was only by the forbearance of its creditors, who hoped to realize more by the mortgage than by pressing their claims at once, that it was permitted to drag on for some months longer.

What is meant by insolvency is well settled (*11 Encycl. L. 168*), and when employed in this statute its ordinary significance is presumed to have been in the mind of the legislature.

Chief-Justice Shaw, in *Thompson* v. *Thompson et al., 4 Cush. 127*, said : " By the term ' insolvency,' however, as used in this statute, I do not understand an absolute inability to pay one's debts at some future time upon the settlement or winding up of all a trader's concern, and a trader may be said to be in insolvent circumstances when he is not in a condition to pay his debts in the ordinary course, as persons carrying on trade usually do." *Bayley* v. *Schofield, 1 Mau. & Sel. 338 ; Shone* v. *Lucas, 3 Dowl. & R. 218.*

The same definition of insolvency under the federal Bankruptcy law was given in *Buchanan* v. *Smith, 16 Wall. 277, 308.*

Mr. Justice Van Syckel, in his opinion in *National Bank of the Metropolis* v. *Sprague, 6 C. E. Gr. 530, 538,* said : " It is abundantly proved that when this mortgage was executed Sprague & Stokes were pressed by their creditors for payment or security for their claims, and unable to meet their pecuniary obligations, and involved in debt to an amount beyond their ability to pay, and that their creditors were informed of their condition. Under this state of facts Sprague & Stokes, in contemplation of law, were insolvent. Insolvency means a general inability of a debtor to answer pecuniary engagements, and it does not follow that he is not insolvent because he may ultimately have a surplus after winding up his affairs. *Sugd. Vend. & P. 668 ; Bayley* v. *Schofield, 1 Mau. & Sel. 338 ; Hall* v. *Swift, 4 Bing. N. C. 381.*"

In *Brouwer* v. *Harbeck, 9 N. Y. 589*, Mr. Justice Allen said : "A corporation, like an individual, is insolvent when it is not able to pay its debts. Insolvency means a general inability to answer, in the course of business, the liabilities existing incapa-

ble of being enforced.   *Cutten* v. *Sanger, 2 Younge & J. 459 ; Bouv. Inst. 187.*   This term had a well-known significance at the time of the enactment of the law in question.   It was used by the legislature with reference to such known significance."

This case involved a construction of the New York act preventing preference by insolvent corporations.

To the same purport is the case of *Sewell* v. *Cape May and Sewell Point Railroad Co., 30 Am. & Eng. Ry. Cas. 155.*

Entirely ignoring all the testimony in regard to Magowan's pecuniary condition, which was admitted upon another point in the case, in my judgment it is proved that the corporation was actually insolvent on May 1st, 1896.

Nor do I see any substance in the insistence that the creditors who took these bonds were *bona fide* purchasers for valuable consideration.

It is contended that some of these notes were endorsed by Magowan personally, and that those creditors who surrendered the notes when they accepted the bonds surrendered his personal endorsement, which was a matter of value, and so put them in the posture of purchasers for value.   In respect to this contention, it may be remarked that the arrangement by which the extension notes were given was in the nature of a composition agreement and invalidated the personal endorsement of Magowan given to some to the exclusion of other holders of these extension notes.   *Greenh. Pub. Pol. 141.*

In the second place, the evidence taken upon this point seems to show that the endorsement of Magowan could with difficulty be regarded as possessing any value.   But the conclusive answer, in my judgment, is that when this mortgage was taken these creditors had knowledge of the previous career of this company and of its financial embarrassments, and cannot be regarded as purchasers without notice.

I will advise that the decision of the receiver, rejecting this claim as a preferred claim, be affirmed.