A. J. H.

---

# BALFOUR *v.* WHEELER.

*(District Court, S. D. New York.* February 19, 1883.)

1. BANKRUPTCY—PREFERENCE.

An assignee in bankruptcy, though representing only creditors at large, can maintain an action to set aside as fraudulent and void a sale upon execution issued on a judgment on a *cognovit* note of the bankrupt given with the intent to secure a preference.

2. SAME—COGNOVIT NOTE—REV. ST. § 5128.

Where such *cognovit* note was taken 10 months before proceedings in bankruptcy, but at a time when the debtor was insolvent and known to be so by the creditor, and the *cognovit* note was given pending an extension to the debtor by his creditors, and for the purpose of securing a preference to the defendants in any contingency, and thereafter within two months of filing a petition in bankruptcy judgment was entered on the *cognovit* note, and a levy made upon the debtor's stock of goods, and the debtor thereupon gave consent in writing to a private sale thereof by the sheriff on execution pursuant to the law of Ohio, under which the property was sold to the defendants at such private sale, and the bankrupt remained in charge as before, *held,* that the seizure and sale on execution were " procured or suffered by the bankrupt" within two months of the bankruptcy proceedings, with the intent to give a preference, and that the sale was void under section 5128 as against the assignee in bankruptcy, both as a seizure procured by the bankrupt as well as an " indirect transfer or conveyance." The cases of *Clarke* v. *Iselin* and *Watson* v. *Taylor*, 21 Wall. 360, 368, distinguished. *Held,* also, that the defendants should account to the assignee for the price of the property, on the sale to them.

In Bankruptcy.

*C. Steward Davison,* for complainant.

*J. F. Crombie,* for defendants.

BROWN, J. This is an action in equity brought by the complainant, as assignee in bankruptcy of Lucius A. Benton, to set aside as fraudulent and void a sale under execution to the defendants of the stock of goods of the bankrupt at Cleveland, Ohio, on the twenty-fifth of June, 1878.

On July 19, 1878, a petition against Benton was filed in the district court of the United States for the northern district of Ohio, by certain of his creditors, in involuntary proceedings in bankruptcy upon which he was adjudicated a bankrupt on August 5th following. On September 18th the complainant was appointed assignee in bankruptcy, and an assignment duly executed to him of the bankrupt's property. The defendants were engaged in business in the city of New York, under the firm name of Wheeler, Parsons & Hays.

For some years previous Benton had been engaged in the business of jeweler and silversmith at Cleveland, Ohio. On the twenty-fourth of January, 1877, not being able to meet his engagements, a meeting of creditors was called in New York, at which an oral agreement was arrived at for an extension, and the payment in installments of 5 per cent. a month after July, 1877, provided 90 per cent. of the creditors agreed to it. The defendants at that time held a *cognovit* note of the bankrupt for the sum of $7,231.58, which, under the laws of Ohio, authorized the defendants to enter up judgment against the bankrupt and issue execution thereon at any time without further notice.

A paper was drawn up embodying the agreement, which was afterwards left in charge of the defendants. They did not themselves sign it, but by their subsequent letters ratified it and agreed to its terms. In the list of debts presented at the meeting of creditors the defendants' claim of $7,231.58 was mentioned, as well as a further indebtedness of about $500 for goods of the defendants sold by the bankrupt on commission account.

In the month of July following, Benton paid the first installment of 5 per cent. to various creditors, and the sum of $361.59 to the defendants, being 5 per cent. on their *cognovit* note. During all this period Benton was in active and frequent correspondence with the defendants, and from various letters passing between them it is evident that the defendants regarded him as insolvent, and unable to carry out even the lenient terms of the extension. On January 13, 1877, they say to him, "You are a fit subject of compromise," and, in reply to his offers to do whatever they might desire, say: "We wrote Ingersoll [their attorney in Cleveland] to see you, and be

prepared, in case somebody got ugly, to protect us anyhow;" and in several subsequent letters Benton offered, in substance, to do for their security whatever they desired.

In the latter part of July, 1877, after the first installment of 5 per cent. had been paid, one of the defendants went to Cleveland, and, after an interview with Benton in which it was proposed that, if necessary in order to continue payment to the other creditors, the installments payable to the defendants might be omitted, obtained from him, on the first of August, 1877, a new *cognovit* note for the sum of $9,566.77, which embraced the amount due upon the former *cognovit* note, and about $1,800 in addition. This last *cognovit* note was not made known to any of the other creditors. The defendant continued to pay the other creditors in part, and for some months thereafter obtained goods from them on credit.

On June 7, 1878, judgment was entered upon the *cognovit* note, and execution to the sheriff issued upon the same date, under which a levy was made upon Benton's stock of goods. On June 11, 1878, Benton signed a written consent to a private sale of the goods on execution, under which an order therefor was entered in accordance with the law of Ohio, and a private sale thereunder was made for the sum of $7,144.30, of all Benton's stock of goods, to the defendants on the twenty-fifth of June, without advertisement or notice to the other creditors. The proceedings in bankruptcy having been commenced against Benton in July following, as above stated, the assignee, on the twenty-eighth of December, 1878, filed his bill of complaint in this suit against the defendants to have the sale declared fraudulent and void as against the complainant, and to procure an account and payment for the goods or their value from the defendants.

Upon the facts above stated, and the testimony, and numerous letters between the bankrupt and the defendants, which have been put in evidence, the following conclusions seem to me to be unavoidable:

1. That Benton, at the time of the meeting of his creditors in January, 1877, and thenceforward until the adjudication in bankruptcy, was at all times insolvent, and was known to be so, to himself and to the defendants.

2. That when the *cognovit* note was given on August 1, 1877, both Benton and the defendants knew that he was unable to fulfill the terms of the agreement for an extension, and that this *cognovit* note was given for the purpose of securing a preference to the defendants, and of enabling them at a moment's notice, whenever trouble should

be threatened, to appropriate to themselves the whole stock of goods to the exclusion of other creditors.

3. That Benton and the defendants were previously in confidential communication, and continued so thereafter, acting in concert for the preference of the defendants.

4. That the written consent given by Benton on the eleventh of June, 1878, to the private sale of his stock of goods under execution was given in pursuance of his previous promise to do whatever the defendants might desire for their security, and for the purpose of securing a private sale of the goods to the defendants for their benefit and preference, and to enable him, as their agent, to continue in possession of the goods until they should be sold, as was subsequently done.

5. That by means of the installments paid to the other creditors, and the *cognovit* being kept secret from them, Benton obtained from other creditors a false credit, upon which he obtained other goods on credit, and that it was designed by the defendants and by Ingersoll, their attorney, to postpone action under the *cognovit* note until it was believed they might proceed thereon without danger from the bankrupt law. See particularly their letters of February 26, 1877, July 11, 1877, and January 14, 1878.

From these conclusions, as to the facts and the intentions of the parties, it seems to me that it is not to be doubted that the bankrupt in this case did, within the terms of section 5128, "with intent to give a preference to the defendants, procure or suffer his property to be seized on execution" in favor of the defendants, and that they "had reasonable cause to believe him insolvent," and knew that the seizure was made in fraud of the bankrupt act. *Little* v. *Alexander*, 21 Wall. 500; *Buchanan* v. *Smith*, 16 Wall. 277; *Wilson* v. *City Bank*, 17 Wall. 473, 487.

The objection that the plaintiff, as representing only creditors at large, is not in a condition to maintain this action, has been repeatedly considered and overruled. *Platt* v. *Matthews*, 10 Fed. Rep. 280; *Platt* v. *Mead*, 9 Fed. Rep. 91, 96.

It is contended on the part of the defendants that the case does not come within section 5128 as amended, because the act of the bankrupt in executing the *cognovit* was more than two months prior to the adjudication in bankruptcy, although the actual entry of judgment and the levy of execution under it were less than two months previous.

It would be an abuse of words to say that under circumstances like these the bankrupt had not "procured or suffered the seizure of his

property on execution." The seizure was not made until within two months of the adjudication in bankruptcy; and consequently if he did procure it, or suffer it at all, he procured or suffered it within the two months. The signing of the *cognovit* gave a continuing authority to enter the judgment and issue execution whenever the defendants desired, and such was its intention; and it speaks, therefore, from the time that it was carried into effect, so far as to constitute a "procuring or suffering of the seizure" of the bankrupt's property; and the knowledge and actual intention of both parties at the time the *cognovit* was signed, must adhere to and characterize it when put into execution. And as this intention of both parties was in fraud of the bankrupt law, the seizure, being within two months of the petition in bankruptcy, must, under section 5128, be held fraudulent and void.

The present case differs essentially from the cases of *Clark* v. *Iselin* and *Watson* v. *Taylor*, 21 Wall. 360, 378; for in those cases it is expressly found that there was no fraud nor collusion, and that the creditor had no reason to believe that the debtor was insolvent at the time when the warrants to confess judgment were given. The opinion of the majority of the court, delivered by Mr. Justice STRONG, in *Clark* v. *Iselin*, turns entirely, as I read it, upon the absence of any fraudulent intention or knowledge of insolvency at the time the warrants were given, and upon the fact that the confessions of judgment were lawful when made. The debtor's intention to give a preference was held essential to make the seizure under execution invalid, as it plainly is, under section 5128; and as there was no subsequent act of the debtor after the warrant was signed, and the debtor had no longer any power over it, the only possible intention that could be imputed to the seizure on his part, was such an intention as existed when the warrant was signed by him; and that intention not being to give a preference, the essential element of an intention to prefer the creditor was wanting, so as to make the acts invalid.

In this case the facts are the opposite, as I have found. The signing of the *cognovit*, instead of being a lawful act when made, as in *Clark* v. *Iselin*, (p. 374,) was itself unlawful and a fraud upon the bankrupt act. But in addition to the original act of signing the *cognovit* for the unlawful purpose of giving a preference, we have in this case the bankrupt's active participation in the proceedings through which the defendants obtained title to these goods, viz., his consent in writing on the eleventh of June, within less than two months of the bankruptcy, to a private sale, evidently designed for the benefit of the defendants. This consent was a necessary condi-

tion of the private sale in the mode in which it was obtained. Having obtained title to the property by means of this act, the defendants cannot disclaim it as non-essential.

Construing these various steps together, they seem to me to constitute, moreover, in effect an "indirect transfer" by the bankrupt of his property to the defendants by means of a judgment, execution, and consent to a private sale by the sheriff; means purposely adopted to avoid, if possible, the hazards of a *direct* conveyance to the same defendants for the same purpose of an unlawful preference.

Section 5128 makes a "transfer or conveyance" by the insolvent of any part of his property, either "directly or indirectly," also void under the conditions above named. Such proceedings as were had in this instance seems to me a mere collusive device to effect such an "indirect transfer" of all the debtor's property to the defendants. In the *Case of Schick*, 2 Ben. 5, BLATCHFORD, J., says:

"I think, also, that the transaction was, in substance and effect, within the provisions of section 39, a *transfer* of the property of the debtor, made by him, and so made with intent to delay, hinder, and defraud his creditors." *In re Pitts*, 8 FED. REP. 263.

The defendants should, therefore, account to the plaintiff as assignee for the value of the property, the same having been sold and converted to the defendants' use. As the value was appraised by sworn appraisers, and the purchase by the defendants was at the price of two-thirds the appraised value, no injustice can be done to the defendants by charging them with this purchase price; and, I think, it will be better for the estate to accept this amount as the value of the goods, rather than to seek to increase it through a difficult and tedious reference.

I allow judgment, therefore, against the defendants for the sum of $7,144.30, with interest from June 24, 1878, with costs.