## CAPITAL NATIONAL BANK *v.* WILKERSON, TRUSTEE.

[No. 4,994.　Filed November 3, 1905.]

1. PLEADING.—*Complaint.*—*Bankruptcy.*—*Demand.*—In an action by a trustee in bankruptcy for the recovery of an unlawful preference it is not necessary to allege a demand. *Goldberg* v. *Harlan,* 33 Ind. App. 465, followed. p. 469.

2. APPEAL AND ERROR. — *Refusal to Transfer.* — *Effect.* — The denial by the Supreme Court of a motion to transfer a cause decided by the Appellate Court is an approval by the Supreme Court of the decision of the Appellate Court. p. 470.

3. BANKRUPTCY. — *Statutes.* — *Preferences.*—*"Void."*—The word "void" as used in the bankruptcy act of 1867 (14 Stat. at Large, p. 517) means "voidable," a preference under such act being valid as to all persons except the assignee in bankruptcy. p. 470.

4. SAME.—*Insolvency.*—*What Is.*—Whenever a person's property, exclusive of that which he has fraudulently disposed of, is worth, at a fair valuation, less than the amount of his debts, he is insolvent under the bankruptcy act. p. 473.

5. SAME.—*Preferences.*—*When Collectible by Trustee.*—Before a trustee in bankruptcy can recover an unlawful preference he must prove that the creditor receiving same had reasonable cause to believe that the debtor was insolvent and that a preference was being obtained, proof of actual knowledge of insolvency being unnecessary. p. 473.

6. SAME. — *Preference.* — *Constructive Knowledge.* — Where the facts proved, in an action by a trustee in bankruptcy for the recovery of an unlawful preference, are such as to cause an

ordinarily prudent man, in defendant's situation, to believe the debtor was insolvent, defendant will be chargeable with such knowledge, and his preference will be unlawful, whether the debtor intended it as a preference or not. p. 474.

7. BANKRUPTCY.—*Insolvency.*—*Reasonable Cause to Believe.* —Where the evidence shows that the debtor conducted a bank and on October 9, 1900, had overdrawn his account with defendant bank $350.84, which remained nine and one-half months; that on July 25, 1901, such overdrafts were $2,725.78 and notes due for advances were $3,000; that debtor had placed collateral notes aggregating $7,800 as security for such debts; that defendant did not rely upon $5,000 of such collateral as being of any value; that some of such notes were from three to eight months overdue, and defendant had made no effort to collect same; that defendant's agent visited debtor July 26, 1901, and received $500 and a promise of $1,000 the next day, which was paid; that on September 3, 1901, defendant's agent took an assignment of such debtor's tangible goods; that debtor told such agent July 21, 1901, he could not meet his overdrafts, and if defendant pushed him he would fail, and that he had loaned too much for his deposits, such evidence sustains a finding of unlawful preference received by defendant by payments received July 26 and 27, 1901. p. 474.

8. SAME.—*Preferences.*—*Collateral Security.*—*Effect.*—The fact that a creditor holds collateral security for its debt, in excess of the amount thereof, does not prevent a payment made by the debtor from being an unlawful preference. p. 478.

9. SAME.—*Preferences.*—*Collateral Security.*—*Title.*—The legal title to collateral securities held by a creditor to secure his insolvent debtor's debt is in the debtor, the creditor having only a special interest therein, and a payment by such debtor is an unlawful preference, if such creditor has reasonable cause to believe him insolvent. Roby, J., dissenting. p. 481.

10. EVIDENCE. — *Indebtedness.* — *Bankruptcy.* — Where a trustee had made an investigation of the amount of indebtedness of a bankrupt within a few days after an alleged unlawful preference, he may testify, in an action to recover such unlawful preference, to the aggregate amount of such indebtedness at such time, it being shown that no substantial change had taken place as to such bankrupt's financial condition from the time of such payment, such evidence tending to show insolvency and also that other creditors could not receive an equal per cent of their debts. p. 483.

11. TRIAL.—*Evidence.*—*Exclusion.*—*Offer.*—No question is presented as to the improper exclusion of evidence where no offer was made as to what the offered evidence was. p. 484.

12. JUDGMENT. — *Bankruptcy.* — *Preferences.* — *Interest.* — The trustee in bankruptcy is entitled to a judgment for the amount of an unlawful preference and for interest on the same from the commencement of the action for its recovery. p. 484.

From Superior Court of Marion County (64,217) ; *John L. McMaster,* Judge.

Action by Alfred C. Wilkerson, as trustee in bankruptcy of the estate of James M. Key, against the Capital National Bank. From a judgment for plaintiff, defendant appeals. *Affirmed.*

*H. J. Milligan* and *C. W. Watkins,* for appellant.

*W. A. Ketcham* and *Lesh & Lesh,* for appellee.

WILEY, C. J.—Appellee sued appellant to recover an alleged preference under subdivision b, §60 (30 Stat. at Large, p. 562), of the national bankruptcy law of 1898. The complaint was in a single paragraph, to which an answer in denial was filed. Trial by the court, and finding and judgment for appellee. Appellant's motion for a new trial was overruled.

The errors assigned are: (1) That the complaint does not state facts sufficient to constitute a cause of action; and (2) that the court erred in overruling the motion for a new trial.

The only objection urged to the complaint is that it does not show a legal demand for the return of the unlawful preference. The complaint proceeds upon the theory that the demand was necessary, and that such demand was duly made. Counsel for appellant assert the proposition, also, that it is necessary in an action of this character to allege a demand by the trustee in bankruptcy against the creditor for the return of the property, or its value if return can not be had, and a refusal on the part of the creditor; and until such demand and refusal the holding of the creditor is legal and valid. It will thus be observed that both parties to this appeal affirm that a demand is necessary. In this position they are in error. This

court, in the case of *Goldberg* v. *Harlan* (1904), 33 Ind. App. 465, held that no demand was necessary before the commencement of an action by a trustee in bankruptcy to enforce his rights as such trustee to property unlawfully transferred by the bankrupt. The decision in that case was put upon the proposition that the whole transaction under the bankruptcy act was unlawful, and in such case a

2. demand is unnecessary. The Supreme Court has approved the rule there declared by overruling appellant's petition to transfer.

Subdivision b, §60, *supra,* is as follows: "If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of the petition and before the adjudication, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

Under the bankruptcy act of 1867 (14 Stat. at Large, p. 517), a preference to a creditor was declared to be void, while in the act of 1898 it is declared to be voidable.

3. It seems to us that the word "void" in the act of 1867 must be held to be used in the sense of voidable and not void. A preference under the act of 1867 was good, not only between the parties, but as to all the world, unless judicial proceedings were brought by the assignee under the act to avoid it. If no suit was brought, the preference in the hands of the party preferred could not be assailed by the creditors of the bankrupt, or by any other person. Where a suit is brought by a creditor's bill against an alleged fraudulent grantee, no demand is necessary; and this is put upon the ground that such grantee is consciously attempting to defeat the legal rights of the creditors. As a general rule, a person who knowingly wrongs another is not entitled in any sort of suit to a previous demand to make restitution. Under the existing bank-

ruptcy law, the trustee can not maintain a suit against the party alleged to have received an undue preference, unless it is made to appear that such person had reasonable cause to believe that it was intended thereby to give a preference. It will be seen, therefore, by the very words and spirit of the statute, that, before the action can be successfully maintained against a person alleged to have received an undue preference, it must be shown that he received it believing that he was a participant in an unlawful act, or, in other words, that he was receiving the property or other thing of value in violation of the statute, and therefore, as to other creditors, was a wrongdoer. We can not perceive any reason why a man, or a corporation, who is a participant in an attempted violation of the law, having reason to believe that he is guilty of such participation, should be entitled to notice before suit is brought against him. Under the express provision of the statute, unless he has reasonable cause to believe that he was such participant in an attempted unlawful act, the action could not be maintained against him; and why should a party who has reasonable cause to believe that he is a wrongdoer have notice before suit is brought?

It should be observed that the remedy which appellee seeks here to enforce is to recover a preference which is purely of statutory creation. The trustee in such case must bring himself within the provisions of the law which defines what shall constitute a preference, and creates the right in him to recover it. Subdivision a, §60, *supra,* defines what a preference shall be, to wit: "A person shall be deemed to have given a preference if, being insolvent, he has procured or suffered a judgment to be entered against himslf in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

Subdivision b, §60, *supra,* provides the constituent

elements necessary to enable the trustee to recover the preference. These constituent elements are to be construed with subdivision a, §60, *supra,* and are: (1) The debtor must have been insolvent at the time; (2) he must have procured or suffered a judgment or made a transfer; (3) the result of either of which must be to give one creditor a greater percentage of his claim than others; (4) such creditor must have had reasonable cause to believe this result was intended; (5) it must have been within four months before the filing of the petition, or between the filing and adjudication. Brandenburg, Bankruptcy (3d ed.), p. 597.

While the statute does not declare in words that a preference, under the conditions named therein, is unlawful, yet, in effect, that is what is meant by the statute. The question is simply this: In receiving a preference under the conditions named in the statute, is a creditor in the wrong? To hold under the provision cited that a trustee should make a demand before filing his suit to recover, would require reading into the statute a provision which congress did not see fit to put therein, either by express provision or necessary implication, and would, in fact, be a violation of the terms of the statute which confers upon the trustee the right to recover upon the simple terms therein declared. We therefore hold that it was not necessary for the trustee to allege in his complaint a demand before the bringing of his action.

This being true, the objection urged to the complaint is not well grounded. This brings us to the consideration of the questions presented by the overruling of appellant's motion for a new trial. Counsel contend that the decision of the trial court is contrary to law and not sustained by sufficient evidence. The two propositions may properly be considered together, as they rest upon the evidence.

It is earnestly contended by counsel for appellant that upon the question of demand the evidence was wholly in-

sufficient. It is useless for us to dwell longer upon this branch of the case, in view of the fact that we have held that no demand was necessary.

In the bankruptcy act of 1898, congress defines insolvency as follows: "A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts." 30 Stat. at Large, p. 544, §1 (15).

The evidence fairly establishes the fact that when the two payments were made to appellant, exclusive of them the bankrupt's property was of the aggregate value of $1,431.73, and that his indebtedness was $11,308.12, exclusive of a large sum which he owed to the American Trust & Savings Bank, the exact amount of which was unknown. It is true that the examination made by appellee as to the assets and liabilities of the bankrupt was made on August 5, being nine and ten days, respectively, after the two payments to appellant. Yet it is shown that the only change in his financial condition between those dates was the transfer of the furniture and fixtures of his bank to appellant. The value of these was fixed at $1,000, and included in the schedule of assets, shown to aggregate $1,431.73. The evidence fully establishes the insolvency of the debtor, within the meaning of the statute, at the time of the payments to appellant.

Before a recovery can be had in a cause of this character, it is incumbent upon the trustee to prove that the party to whom payment is made had reasonable cause to believe that a preference was being obtained. *Grant* v. *National Bank* (1877), 97 U. S. 80, 24 L. Ed. 971; *Stucky* v. *Masonic Sav. Bank* (1882), 108 U. S. 74, 27 L. Ed. 640, 2 Sup. Ct. 219; *Browning* v. *Hurdle*

(1882), 18 Fed. 164; *Otis* v. *Hadley* (1873), 112 Mass. 100; *Brown* v. *Guichard* (1902), 74 N. Y. Supp. 735, 7 Am. Bank. Rep. 515; *In re Eggert* (1900), 98 Fed. 843. Upon this proposition counsel for appellant earnestly insist and ably argue that the evidence fails to establish the fact that appellant had reasonable cause to believe that it was obtaining a preference.   It is not necessary for the trustee to prove that the creditor had actual knowledge, but both the spirit and letter of the statute are satisfied if the evidence is sufficient to show that he had reasonable cause to believe that the debtor was insolvent, and that he was thus obtaining a preference.   *Coburn* v. *Proctor* (1860), 15 Gray 38; *Wager* v. *Hall* (1872), 16 Wall. 584, 21 L. Ed. 504.

The rule is that if the facts and circumstances with respect to the debtor's financial condition are brought home to the creditor, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose.   *In re Eggert* (1900), 102 Fed. 735, 43 C. C. A. 1; *Boudinot* v. *Hamann* (1902), 117 Iowa 22, 90 N. W. 497; Brandenburg, Bankruptcy (3d ed.), p. 601; *National Exchange Bank* v. *Pepperdine* (1900), 2 Nat. Bank. News 675; *Buchanan* v. *Smith* (1872), 16 Wall. 277, 21 L. Ed. 280; *Wager* v. *Hall, supra; Dutcher* v. *Wright* (1876), 94 U. S. 553, 24 L. Ed. 130; *Merchants Nat. Bank* v. *Cook* (1877), 95 U. S. 342, 24 L. Ed. 412.   It is not necessary to prove that the debtor intended a preference.   *Benedict* v. *Deshel* (1903), 177 N. Y. 1, 68 N. E. 999; *Pirie* v. *Chicago, etc., Trust Co.* (1901), 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171.

The principal argument of appellant's counsel is addressed to the proposition that the evidence does not establish the fact that appellant had reasonable cause to believe that it was obtaining a preference when the two payments were made to it.   On the contrary

they urge there is a total failure of proof upon that question. It clearly appears from the evidence that James M. Key was engaged in the banking business in Andrews under the name and style of the Commercial Bank of Andrews; that appellant was his correspondent in Indianapolis; that he carried an account with it; and that on October 9, 1900, his account was overdrawn $350.84. At that time appellant carried on its books ·a large number of correspondents—banks and bankers—only two of which, besides Key's bank, had overdrawn their accounts. The overdrafts on these two banks were only for a period of about thirty days, while Key's overdraft at the time of his payments to appellant had existed for about nine and one-half months. Key's overdraft extended from October 9, 1900, to the date of the last payment to appellant, and on July 25, 1901, it amounted to $2,725.78. During this period he ·had occasionally executed a note to appellant in payment of his overdraft, and if such note exceeded the overdraft appellant gave him credit upon its books for the balance. His account on appellant's books on July 25, 1901, stood as follows: Overdraft, $2,725.78; amounts due upon notes, $3,000. This made his indebtedness to the bank on that day $5,725.78. To cover this indebtedness, collateral notes aggregating $7,800 had been turned over by Key to appellant. On the day the $500 payment in controversy was made, Key also turned over to appellant an additional collateral note for $300. The evidence shows that all the notes turned over to appellant as collateral, except the last $300 note mentioned, were forgeries; but appellant had no actual knowledge of that fact. Of the $7,800 of collateral notes there were two of $2,500 each, executed by one Nichols, and appellant did not rely upon them as being good, for Mr. Packard, its representative, testified: "We never regarded that as of any particular value. We never took that into account." Appellant knew that the collateral notes held by it, purporting to be

signed S. J. & John Leedy, H. C. Morgan, Pinkerton
& Kelsey, Needham & Cale and L. T. Mills, aggregating
·a large amount, were from three to eight months past due,
and hence knew they were dishonored paper.   Appellant
had made no effort to collect them.   On July 26, while
Key's account was overdrawn in the sum of $2,725.78,
and while appellant held the collateral notes above indi-
cated, it sent its representative, Mr. Packard, to Andrews,
where Key lived and conducted his banking business, to
see him.   When asked why he went to Andrews, Mr. Pack-
ard said it was to see Key; that he had never seen him;
that he thought he would go and spend a part of the day
with him at his place of business.   Packard further tes-
tified that Key was at that time indebted to appellant
upon three notes in the sum of $3,000, and had an over-
draft against him of about $2,300.   He spoke to Key
about the overdraft, and told him he had better give him
exchange to "square it up," as it did not look well upon
the books.   Thereupon Key gave him exchange for $500
on the American Trust Company of Chicago, and prom-
ised to send him $1,000 the next· day, which he did.   On
September 3 Packard again went to Andrews, representing
appellant, and took an assignment to it of all of Key's
bank furniture, and after such assignment was made he
stated, in answer to a question as to whether he had any
suspicion that Key was insolvent:   "No,. I had arrived at
no condition of mind of that kind positively."   Key testi-
fied that about July 21, 1901, he told Packard that he
could not meet his overdraft; that he would have to have
an extension of time; and that if the bank refused to extend
him further credit it would cause his failure.   He further
testified that when he gave Packard the exchange for $500
and agreed to send him $1,000 the next day, Packard
agreed that upon the receipt of the $1,000 he would return
him $500 in currency, which he afterward refused to do.
Key had at that time other business interests at Avilla and

Cromwell, and testified that he told Packard that his partner had made some bad investments, and, in order to prevent failures there, he had been compelled to assist him. Key advised appellant at different times that he had loaned too much money for his deposits, and he was sending notes to it for discount. In the trial of a cause in the Wabash Circuit Court, in an action brought by appellant upon the Leedy note, Packard testified that when he got the $500 draft of Key on July 26, he was afraid that it might not be paid, but that "it went through all right."

We have set out the substance of the facts pertinent to the issue as to whether appellant had reasonable ground to believe that it was obtaining a preference in the two payments made to it by Key. The knowledge of Packard, who represented appellant in these transactions with Key, was its knowledge. As to some of the facts, also, they were communicated directly to the president of the bank. Hence appellant was chargeable with knowledge of the fact that Key was indebted to it upon overdrafts and upon notes in a sum aggregating $5,725.78. It knew, also, that it held collaterals aggregating something over $7,000, of which amount it knew $5,000 was worthless; or, to state it in the language of Mr. Packard: "We never regarded that as of any particular value. We never took that into account." To secure payments on these overdrafts, etc., appellant sent its representative to Key's place of business upon different occasions, and when he got the draft for $500 he was so unfavorably impressed with the financial condition of Key he was afraid it would not be paid. Following soon upon the two payments, Packard went to Andrews, and took an assignment of all of Key's bank furniture, and aside from this the balance of Key's assets was less than $500.

To say that appellant in good faith had over $7,000 of collaterals to secure an indebtedness of something over $5,000, in view of the fact that it made repeated

attempts to secure payments in cash or exchange to apply on the indebtedness, and possessing, as it did, the · knowledge that Key had "over loaned," and was pressed for ready money, and being confronted with the damaging statement that if appellant would not extend him further credit he would fail, would be to declare that courts and juries can not make reasonable deductions and inferences from established facts, so as to arrive at a correct conclusion as to issuable facts. These facts are sufficient to put appellant upon inquiry. The fact was brought to appellant's knowledge that Key was in financial straits, and it knew it was receiving payments from him when he was in that condition. While this fact, of itself, may not have been sufficient to charge it with knowledge that it had reasonable ground to believe it was obtaining a preference, it was a fact which the trial court was authorized to consider. With all the facts to which we have adverted before us, we do not see how the trial court could have reached a different conclusion from what it did.

The test, as defined by the statute, is not what the creditor believed, but whether it had reasonable cause to believe that it was obtaining a preference. The facts recited demonstrate the wisdom of the rule declared by the act of congress. From a careful consideration of the evidence upon the question whether appellant had reasonable ground to believe that it was obtaining a preference, our conclusion is that the record contains ample evidence upon which the trial court could reasonably find, and must have found, that fact to exist.

Counsel for appellant put much stress upon the fact that, when the two payments were made to it, it held collateral notes largely in excess of the amount due 8. from Key to it. They say: "We are utterly unable to understand how a creditor who has security, apparently valid, for fifty per cent more than his debt, could believe that by getting a payment from his debtor of

thirty per cent of the debt he was getting a preference." We can not see how appellant is entitled to any relief upon the ground of its having held collaterals largely exceeding in amount the indebtedness which Key owed to it. Counsel have not cited us to any authority which throws any light upon this proposition, but our search has led us to two cases which are squarely against them in this contention, to wit: *Bartholow* v. *Bean* (1873), 18 Wall. 635, 21 L. Ed. 866, and *Harris* v. *Second Nat. Bank* (1903), 110 Tenn. 239, 75 S. W. 1053.

In the first case just cited, Mr. Justice Miller, delivering the opinion of the court, said: "Does the fact that Wilcox, the indorser, was solvent, and was liable, change the rule as to payment as a preference? The statute in express terms forbids such preference, not only to an ordinary creditor of the bankrupt, but to any person who is under any liability for him; and it not only forbids payment, but it forbids any transfer or pledge of property as security to indemnify such persons. It is, therefore, very evident that the statute did not intend to place an indorser or other surety in any better position in this regard than the principal creditor, and that if the payment in the case before us had been made to the indorser, it would have been recoverable by the assignee. If the indorser had paid the note, as he was legally bound to do, when it fell due, or at any time afterwards, and then received the amount from the bankrupt, it could certainly have been recovered from him. Or if the money had been paid to him directly instead of to the holder of the note it could have been recovered, or if the money or other property had been placed in his hands to meet the note or to secure him, instead of paying it to the bankers, he would have been liable. He would not, therefore, have been placed in any worse position than he already occupied if the holders of the note had refused to receive the money of the bankrupt. It is very obvious that the statute intended, in pursuit of its

policy of equal distribution, to exclude both the holder of the note and the surety or indorser from the right to receive payment from the insolvent bankrupt. It is forbidden. It is called a fraud upon the statute in one place and an evasion of it in another. It was made by the statute equally the duty of the holder of the note and of the indorser to refuse to receive such a payment. Under these circumstances, whatever might have been the right of the indorser, in the absence of the bankruptcy law, to set up a tender by the debtor, and a refusal of the note holder to receive payment, as a defense to a suit against him as indorser, no court of law or equity could sustain such a defense, while that law furnishes the paramount rule of conduct for all the parties to the transaction; and when in obeying the mandates of that law the indorser is placed in no worse position than he was before, while by receiving the money the holder of the note makes himself liable to a judgment for the amount in favor of the bankrupt's assignee, and loses his right to recover, either from the indorser or from the bankrupt's estate. We are of opinion, therefore, notwithstanding the hardship of the case, which is more apparent than real, that the payment must be held to be a preference within the bankruptcy law, and that the judgment of the court below, that the assignee should recover it, must be affirmed."

In the case of *Harris* v. *Second Nat. Bank, supra,* the facts exhibited show that Rose B. Prewitt conducted a mercantile business under the firm name of J. J. Prewitt & Co.; that she transacted her banking business with the appellee, and became indebted to it by note in the sum of $3,500, upon which there were three securities. Mrs. Prewitt was allowed by the bank to overcheck her account to the amount of $500, and at the date of these transactions she was indebted to the bank, over and above the note, for $3,500 upon an overcheck of $600, and also upon a note for $795, indorsed by one of the securities on the

former note. During the summer of 1900, a payment of $1,000 was made on the $3,500 note. In July or August of the same year she made application to the bank to increase her line of overcheck to $800, which was granted, but very soon thereafter this concession was withdrawn, and again limited to the overcheck of $500. At this time it was shown that Mrs. Prewitt was largely indebted, and, being pressed by creditors, was anxious to obtain an additional line of overcheck. But this was declined. Soon thereafter, upon consultation with the cashier of the bank, she sold her entire stock of merchandise, which comprised all of her assets, to one McKinney for the sum of $3,100, and this amount she turned over to the bank in payment of her overcheck of $600 and the balance due on the $3,500 note. A few days thereafter her creditors forced her into involuntary bankruptcy, and she was duly adjudged a bankrupt. The trustee appointed under the proceedings instituted an action to recover from the bank the $3,100 paid to it as an unlawful preference. It was shown that the securities on the $3,500 note were solvent, and, following the case of *Bartholow* v. *Bean, supra,* it was held that the payment to the bank, under the facts exhibited, constituted an unlawful preference.

We can see no difference in principle between a creditor who holds collaterals to secure the payment of his debtor's debt and a creditor whose debt is secured 9. by the indorsement of solvent sureties. In either event it amounts simply to a security. If the principal upon the secured note pays the debt, the sureties are released, and, if the debtor whose obligation is secured by collaterals pays his debt, the collaterals are released, and must be surrendered to the pledgor. The contract of a surety upon a promissory note is a direct undertaking, and he is primarily liable. A creditor who holds collaterals to secure the debt of his debtor has only a special interest in such collaterals, while the legal title remains in the

debtor. 22 Am. and Eng. Ency. Law (2d ed.), 864, and authorities cited. If the latter fails to pay his debt, the pledgee has two remedies: (1) He may proceed personally against the debtor, or (2) he may convert the collaterals into cash, apply the proceeds to the satisfaction of his debt, and account to the pledgor for the residue. 22 Am. and Eng. Ency. Law (2d ed.), 897-904, and authorities cited. It follows, therefore, that the payment made by an insolvent debtor to his creditor, who holds collaterals as security for the debt, is as much an unlawful preference within the meaning of the bankruptcy law as it is where such payment is made under like circumstances upon the note of the insolvent debtor which is secured by solvent indorsers.

The case of *Harris* v. *Second Nat. Bank, supra,* is also very strongly in point on the proposition as to whether the bank had reasonable cause to believe that James M. Key was insolvent, and that it was obtaining a preference. The court said: "It is insisted on behalf of the bank that there is no evidence in the record showing that the bank or any of its officers knew or had reasonable cause to believe, that J. J. Prewitt & Co. were insolvent at the time the note and overcheck were made. We are constrained to believe from the proof that the cashier, at the time he received the payment, was fully aware of the insolvency of this debtor, and that the money received from the sale of the stock of merchandise constituted the entire assets belonging to the bankrupt. The record shows that the cashier had been consulted by Prewitt with reference to obtaining an extension of time from the creditors of J. J. Prewitt & Co. living in St. Louis and Louisville. The cashier was also aware that Mrs. Prewitt had asked an extension of time and additional line of overcheck with the Second National Bank, which that bank, on instruction of the finance committee, had declined to grant. The proof further

shows that, after Mrs. Prewitt had failed to get an additional line of credit from the bank, she offered to sell the stock of goods to the bank, but that it declined to buy, and the cashier admits that, when the bank declined to make a further advance, he said to Mr. Prewitt: 'I believe it would be best to make a general assignment and get matters settled up.' " The facts exhibited in that case, as just disclosed, are certainly no stronger than those in the case at bar, which brought knowledge to appellant through its authorized representative, Mr. Packard, of the financial condition of Key, and yet the court in that case, upon those facts, said: "Surely, in view of these facts, the bank had, in the language of the bankruptcy act, reasonable cause to believe a preference was intended." In the case of *Merchants Nat. Bank* v. *Cook* (1877), 95 U. S. 342, 24 L. Ed. 412, it was held that knowledge of such facts is not necessary, nor even belief, but simply a reasonable cause to believe. We must therefore hold that the evidence disclosed by the record, and upon which the trial court passed, is of such a character as to warrant the conclusion reached, and we can not disturb the finding on that ground without constituting ourselves triers of facts.

Appellant also predicates error upon the admission of certain evidence, upon overruling its motion to strike out certain evidence, and in rejecting evidence offered by it. Appellee was permitted to testify as to the aggregate indebtedness of the bankrupt, and the evidence was objected to on the ground that it related to his indebtedness at a subsequent time. The evidence of appellee upon this point was so closely connected with the time of the payments to appellant that it was competent as tending to prove insolvency. The investigations of the appellee, as trustee, upon which his evidence was based, were made within a few days after such payments, and, as above shown, no substantial change had taken place as

to the debtor's financial condition. *Tennessee, etc., R. Co.* v. *Sargent* (1891), 2 Ind. App. 458. It was competent, for the additional reason that it tended to show that other creditors of the same class would not receive a percentage of their claims equal to that received by appellant.

A. M. Packard was called as a witness on behalf of appellant. Upon his examination in chief, he was asked a question to which an objection was made and sustained. No offer to prove the fact or facts which the questions elicited was made. In such case, to save any question, the party producing the witness must state what he proposes to prove by him in answer to the question. The rule as stated has been enforced in a vast number of cases. See Elliott, App. Proc., §743, note 1, where the authorities are collected and cited. For the same reason there was no error in sustaining an objection to a question asked M. B. Wilson, a witness for appellant, in his examination in chief.

One of the grounds assigned by appellant for a new trial was that the amount of the recovery was erroneous, being too large. The complaint avers that the bankrupt, being insolvent, made two payments to appellant upon a preëxisting indebtedness, aggregating $1,513.17. The judgment was rendered for $1,623.95. The excess over $1,513.17 being for interest. Appellant was entitled to recover interest, and the interest at six per cent from the date of the commencement of the action would amount to $110.78. This added to the principal makes the judgment mathematically correct.

We have considered every question discussed by counsel, and have reached the conclusion that the trial court arrived at the correct result.

Judgment affirmed.

Myers, P. J., Comstock, Black and Robinson, JJ., concur. Roby, J., dissents.

## DISSENTING OPINION.

Roby, J.—It was held by this court in *Goldberg* v. *Harlan* (1904), 33 Ind. App. 465, that no demand was necessary before action by a trustee in bankruptcy to recover an unlawful preference. That decision is controlling here. In determining the quality of appellant's action, both the jury and this court are limited to a consideration of the facts known by it or with knowledge of which it was chargeable at the time of the transaction. These facts were that Key had overdrawn his account with appellant $5,725.78, and had deposited collateral notes to the amount of $7,800 to secure such overdraft; that some of said notes were overdue when the payment in question was made; that no steps had been taken to collect them; and that appellant's officer, testifying with reference to a portion of them, said "that we never regarded them as of any particular value" and that under this state of affairs it accepted certain payments from Key.

It is stated in the main opinion that all the notes held as collateral except one were forgeries, and that appellant knew that $5,000 thereof were worthless. I do not believe that appellant knowingly loaned money upon forged collaterals, and I do not find any evidence justifying the statement that it knew $5,000 of such collaterals were worthless.

The case is reduced to the single proposition which may be illustrated as follows: One holding $7 of collateral notes as security for payment of $5 due obtains an unlawful preference by accepting payment of $5 although he thus releases and renders available to other creditors $7 worth of assets. It is stated in the main opinion: "It follows, therefore, that the payment made by an insolvent debtor to his creditor, who holds collaterals as security for the debt, is as much an unlawful preference within the meaning of the bankruptcy law as it is where such payment

is made under like circumstances upon the note of the insolvent debtor which is secured by solvent indorsers.". Unfortunately the cases cited in support of this conclusion do not sustain it. The verdict can not be sustained except by the legal proposition thus stated in the main opinion; and, it being erroneous, the cause should be reversed.